UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Docket#** 10-cr-147(SLT)(CLP) |
| - versus - | U.S. Courthouse<br>Brooklyn, New York |
| FRANCIS GUERRA,<br>"also known as BF",<br>Defendant | August 23, 2011 |

TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
BEFORE THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Loretta E. Lynch, Esq.**
United States Attorney

BY: **Elizabeth Geddes, Esq.**
**Allon Lifshitz, Esq.**
**Amy Busa, Esq.**
Assistant U.S. Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Gerald J. McMahon, Esq.**
Law Office of
Gerald J. McMahon
26 Broadway
18th Floor
New York, NY 10004

**Matthew Mari, Esq.**
Matthew Mari Law Firm
110 Wall Street
New York, New York

**Transcription Service:** **Transcription Plus II, Inc.**
3859 Tiana Street
Seaford, N.Y. 11783
Transcriptions2@verizon.net

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

**Proceedings**

THE CLERK: Criminal Cause for Detention Hearing, USA v. Francis Guerra, docket number 10-cr-147.

Counsel, your name for the record.

MS. GEDDES: Elizabeth Geddes, Rachel Nash and Allon Lifshitz for the government.

Good afternoon, your Honor.

THE COURT: Good afternoon.

MR. McMAHON: Gerald McMahon and Matthew J. Mari for the defendant, Frank Guerra.

Good afternoon, your Honor.

THE COURT: Good afternoon. I take it that Mr. Guerra understands English.

MR. McMAHON: Yes, he does, Judge.

THE COURT: Okay. We're here for a detention hearing.

MS. GEDDES: Yes, your Honor. The government is prepared to call one witness for today's detention hearing and we're ready to proceed.

THE COURT: All right.

MS. GEDDES: And do you have a copy of the government's detention memorandum filed in --

THE COURT: I have a copy of I think the government's memorandum and I now have a full copy of Mr. McMahon's memorandum, as well. The first copy I received was missing a page or so, so that it's now

complete. So I have reviewed them both and I am ready to proceed. Do you want to go ahead.

MS. GEDDES: The government's first witness and only witness is Special Agent Scott Curtis.

THE COURT: All right. Mr. McMahon, I don't see any reason why you have to stand while we do this.

MR. McMAHON: That's all right, your Honor. Is the direct going to be for a while?

MS. GEDDES: Not necessarily long.

MR. McMAHON: I'll sit, Judge.

**S C O T T  C U R T I S ,**

**called as a witness, having been first duly sworn, was examined and testified as follows:**

THE CLERK: Your name for the record.

THE WITNESS: Scott R. Curtis, C-u-r-t-i-s.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MS. GEDDES:

Q. Good afternoon. Please state and spell your name -- oh, you already did that.

By whom are you employed?

A. Federal Bureau of Investigation.

Q. Are you assigned -- what is your title at the FBI?

A. Special agent.

Q. How long have you been a special agent with the FBI?

A. Over fifteen years.
Q. Are you assigned to a particular squad at the FBI?
A. Yes.
Q. What squad is that?
A. Squad C-38 of the New York office.
Q. And what is Squad C-38 responsible for?
A. Investigating the criminal activities of the Colombo and now Bonanno organized crime families.
Q. Did you participate in an investigation of the defendant Francis Guerra?
A. Yes.
Q. Do you see the defendant present in the courtroom today?
A. Yes.
Q. Please point to him.

MR. McMAHON: I'll stipulate to identification, your Honor.

THE COURT: All right.

Q. As part of your investigation of Mr. Guerra, have you reviewed recordings of Mr. Guerra and his criminal associates?
A. Yes.
Q. Are you familiar with an individual named Thomas McLaughlin.
A. Yes.

Q. Who is he?
A. He as an associate of the Colombo organized crime family.
Q. Has he been convicted of a crime?
A. Yes.
Q. What?
A. He was convicted in the 1990s of drug trafficking and tax evasion.
Q. And was that in connection with organized crime?
A. Yes.
Q. Was that in connection with the Colombo family?
A. Yes.
MR. McMAHON: Your Honor, I object to leading.
MS. GEDDES: Your Honor, this is a detention hearing but I will try not to lead.
THE COURT: Try not to lead as much.
Q. Was Mr. McLaughlin incarcerated?
A. Yes.
Q. For how long?
A. From late 1992 until 2008.
Q. Did Mr. McLaughlin subsequently agree to cooperation with the FBI?
A. Yes.
Q. And did he make recordings with members and associates of the Colombo crime family?

A. Yes.

Q. Have you also had an opportunity to debrief cooperating witnesses and review law enforcement reports and prior trial testimony?

A. Yes.

Q. And is your testimony today based on information you learned from those sources, in addition to your personal participation in this investigation?

A. Yes.

Q. In the course of your investigation, did you learn whether the defendant has any nicknames?

A. Yes.

Q. What are they?

MR. McMAHON: Your Honor, if we are going to have lengthy testimony about what he's learned from various interviews and trial testimony, I wasn't sure of the whole line, can he give a brief description of the materials? For example, if he's reviewed the testimony of three trials, name the trials or if it's interviews of cooperators, name the cooperators and if we could get that, find out where it comes from?

THE COURT: Well you can ask him on cross, if you wish.

Q. What are the defendant's nicknames?

A. He goes by "Frank," "Frankie," "BF". Other people in

the past have referred to him as "Bones".
Q. In your investigation, did you learn whether the defendant was affiliated with organized crime?
A. Yes.
Q. What family?
A. Colombo family.
Q. For how long?
A. Since the 1980s.
Q. Is he a member of the Colombo family?
A. No.
Q. Why not?
A. Because he hasn't been inducted into the crime family yet.
Q. Has he been proposed for induction into the Colombo family?
A. Yes.
Q. When was that?
A. 2010.
Q. And prior to 2010, was Mr. Guerra's membership in the Colombo family discussed among other memnbers and associates of the Colombo family?
A. Yes.
Q. What was discussed?
A. That he was originally proposed in the late 1990s, was incarcerated for a period of time, then came out of

jail in late 2006 and then was subsequently asked whether he wanted to be proposed again into the family.

Q. And did Mr. Guerra indicate whether or not he wanted to be proposed into the Colombo family?

A. Yes.

Q. Did he want to be?

A. Yes.

Q. Did Mr. Guerra and others discuss the defendant's proposed membership with Mr. McLaughlin?

A. Yes.

Q. Directing your attention to September 25, 2009, did Mr. McLaughlin make a recording on or about that date?

A. Yes.

Q. And who did he record on that date?

A. Francis Guerra.

MS. GEDDES: The government is now going to play an excerpt from a recording which is contained on Government Exhibit 1, a copy of which has been provided to the defendant today and we'll also leave a copy with your Honor. We've also provided as well as to the Court and defense counsel, and --

MR. McMAHON: Are you going to play that now?

MS. GEDDES: The quality will be much better if we play the recording. Oh, one moment. I'm also distributing just a draft transcript of the recording.

THE COURT: Okay.

MS. GEDDES: And a copy of this has already been provided to defense counsel.

THE CLERK: Apparently the last line was cutoff, Judge.

MS. GEDDES: The government can provide a longer excerpt.

MR. McMAHON: But you'll stipulate that what was said as far as on the transcript was said by this defendant?

MS. GEDDES: The government --

MR. McMAHON: I got enough of that.

MS. GEDDES: I got enough of that. Yes, the government will stipulate to that.

(Tape played-back)

Q. Special Agent Curtis, on the recording Mr. Guerra states "They're not going to do nothing for Fatso." Based on your experience and knowledge of this investigation, who was Fatso a reference to?

A. Larry Sessa.

Q. Based on your knowledge of this investigation, was Larry Sessa proposed to be inducted into the Colombo family?

A. Yes, eventually; yes.

Q. Do you have information in regard to whether the

defendant participated in crime in connection with the Colombo crime family?
A. Yes.
Q. Based on your investigation, what types of crime did the defendant commit in connection with the Colombo family?
A. Drug dealing, extortion, murders.
Q. Are you familiar with the Colombo family war?
A. Yes.
Q. What was that?
A. It was a dispute between two factions of the Colombo family; the Arena faction and the Persico faction.
Q. And you referenced the Arena faction. What is that a reference to?
A. Members of the Colombo family that were loyal to Vic Arena who was the acting boss at the time.
Q. And the Persico faction, what is that a reference to?
A. Those were members and associates who were loyal to Carmine Persico who was the official boss of the Colombo family at the time.
Q. When was the Colombo family war, approximately?
A. Approximately 1991 through '93.
Q. Was the defendant a member of either the Arena faction or the Persico faction?
A. The Persico faction.

Q. Do you have information regarding the murder of Joseph Scopo?
A. Yes.
Q. How was Joseph Scopo murdered?
A. He was shot outside his residence in Queens, New York.
Q. Was that in connection with the Colombo family war?
A. Yes.
Q. When was Mr. Scopo shot?
A. On or about October 20, 1993.
Q. Did you learn whether the defendant participated in that murder?
A. Yes.
Q. Did he?
A. Yes.
Q. Did any Colombo crime family members or associates discuss the murder of Scopo with Thomas McLaughlin while Mr. McLaughlin was cooperating?
A. Yes.
Q. Who did that?
A. Anthony Russo.
Q. Who is Anthony Russo?
A. At the time of his arrest, he was an acting captain in the Colombo organized crime family.
Q. When was Mr. Russo arrested?

A. January of this year.
Q. What was his relationship with the defendant, Mr. Russo's relationship with Mr. Guerra?
A. They were best friends.
Q. Following Mr. Russo's arrest in January of this year, did he agree to cooperate with law enforcement?
A. Yes.
Q. I am showing you what's been marked for identification as Government Exhibits 2-A through 2-D, a copy of these have been previously provided to defense counsel. Do you recognize those?
A. Yes.
Q. What are those?
A. They are copies of photographs that Anthony Russo's wife provided to the FBI.
Q. And beginning with Government Exhibit 2-A, do you recognize the individuals in that photograph?
MR. McMAHON: Can we have some indication of which are which, Judge?
MS. GEDDES: Did I not -- oh, I am sorry.
Q. Beginning with Government Exhibit 2-A, who is depicted in that photograph?
A. From left to right, as I am looking at it, Frank Guerra, Anthony Russo, Anthony Ferrara, Frank Guerra's wife and Anthony Russo's wife.

Q. I am now showing you Government Exhibit 2-B. Who is depicted in that photograph?
A. From left to right, I forget who the individual on the left is, in the middle is Danny Persico and on the right is Frank Guerra.
Q. Government Exhibit 2-C, who is depicted there?
A. From left to right, Anthony Stropoli, Frank Guerra, Anthony Russo.
Q. And Government Exhibit 2-D?
A. From left to right, Frank Guerra and Anthony Russo.
Q. You mentioned an individual by the name of Anthony Ferrara. Who is he?
A. He's an associate of the Colombo family.
Q. How about Anthony Stropoli?
A. He is a soldier in the Colombo family.
Q. Directing your attention to April 10, 2010, did Mr. McLaughlin make a recording on that date?
A. Yes.
Q. Who, if anyone, did Mr. McLaughlin record that day?
A. Anthony Russo and others.

MS. GEDDES: I'm now going to play a second excerpt from Government Exhibit 1. Before I do, I'm going to distribute a draft transcript of this excerpt, a copy of this has previously been provided to defense counsel.

(Tape played back)

Q. Did you have an opportunity to debrief Mr. McLaughlin following his making of this recording?

A. Yes.

Q. Based on your debriefing of Mr. McLaughlin, as well as your participation of this investigation, who was the individual identified or referenced as "Joey" on the first page when Anthony Russo was speaking on line 17?

A. Joe Scopo.

Q. And on the second page, on line 19, when Mr. Russo stated "Unless John missed", do you know who the "John" Mr. Russo was referring to was?

A. John Pappa.

Q. And on line 24 on the second page, Anthony Russo states, "BF was in the backseat." Who is --

MR. McMAHON: Judge, I object to the characterization. I want the record to reflect that I did not hear "BF" on the tape recording before you decide whether (inaudible).

MS. GEDDES: Let me rephrase.

Q. Special Agent Curtis, you've had an opportunity to review this recording prior to today; is that correct?

A. Yes.

Q. And on the recording, did you hear Anthony Russo state that "BF was in the backseat?"

MR. McMAHON: Judge, the tape is not what this witness heard, it's what's on the tape and your Honor will decide whether BF is on that tape or not.

THE COURT: Well, I heard BF.

MR. McMAHON: Okay.

THE COURT: So you know, I don't know what we're arguing about.

MR. McMAHON: Then that's fine, Judge.

THE COURT: But if she wants to lay this as a foundation for her next question, I'll allow it. Go ahead.

MS. GEDDES: Thank you, Judge.

Q. Do you understand who Anthony Russo is referring to when he stated "BF was in the backseat"?

A. Yes.

Q. Who?

A. Francis Guerra.

Q. And on line 44, in response to what's on the transcript as Mr. McLaughlin saying "Yeah, because his hat did not come off." And Mr. Russo responded, "No, because he was in the car behind."

To whom was Mr. Russo referring based on your review of this recording when he stated he?

A. Francis Guerra.

Q. Aside from the defendant, has anyone else been

charged with the murder of Joseph Scopo?
A. Yes.
Q. Prior to this month, who had been charged with the murder of Joseph Scopo?
A. John Pappa and Anthony Russo.
Q. Was Mr. Pappa subsequently convicted?
A. Yes.
Q. Was there a trial?
A. Yes.
Q. Have you had an opportunity to review portions of that trial testimony?
A. Yes.
Q. Did witnesses at Mr. Pappa's trial implicate other individuals in the Scopo murder besides John Pappa?
A. Yes.
Q. Did they implicate Anthony Russo?
A. Yes.
Q. Did they implicate the defendant, Mr. Guerra?
A. Yes.
Q. Was Anthony Russo charged with the Scopo murder?
A. Yes.
Q. Did he subsequently admit his participation in the Scopo murder?
A. Yes.
Q. Did Mr. Russo implicate the defendant in the Scopo

murder?
A. Yes.
Q. What did Mr. Russo say the defendant did on the night of the Scopo murder in sum and substance?
A. That he was parked down the block in a crashed car and after Anthony Russo departed the scene with John Sparacino, Frank Guerra then pulled forward and picked up John Pappa and departed the area.
Q. Who was the individual according to Mr. Russo's information who shot at Joseph Scopo?
A. John Pappa.
Q. And is that --
A. Well, John Sparacino shot at him, missed. Then John Pappa went forward and shot and killed him.
Q. Did Anthony Russo advise whether he knew about any other murders in which the defendant Francis Guerra participated?
A. Yes.
Q. Did he know about other murders?
A. Yes.
Q. Which murders?
A. Michael Merola, Michael Devine, Steve Mancusi.
Q. Did Anthony Russo participate in those murders?
A. No.
Q. How did Anthony Russo learn about the defendant's

participation in those murders?

A. Through conversations he had with Frank Guerra and other --

Q. Who is --

A. And through other individuals.

Q. When was Michael Merola killed?

A. October 1991.

Q. When was Michael Devine killed?

A. January 1992.

Q. When was Steven Mancusi killed?

A. October 1992.

Q. Have other cooperating witnesses provided information about the defendant's roles in any of these murders?

A. Yes.

Q. And does the information provided by those individuals corroborate the information provided by Mr. Russo?

A. Yes.

Q. Directing your attention to February 12, 1997, what if anything happened on that date?

A. There was a situation where Anthony Russo, Frank Guerra and others went up to a securities firm in Manhattan and extorted or attempted to extort the owners of the firm.

Q. Was the defendant later charged with his

participation in that extortion?
A. Yes.
Q. Did he subsequently plead guilty to other charges following his charge with respect to that extortion?
A. Yes.
Q. During his guilty plea allocution, did the defendant make any statements regarding his participation in that extortion?
A. Yes.
Q. What, if anything, did he state?
A. That he and others went up to this firm to confront the owners about things that they were saying about Arthur Alonzo.
Q. Was he asked whether or not he threatened anyone?
A. Yes.
Q. How did he respond?
A. He said yes.
Q. Was Anthony Russo also charged with his participation in that same extortion?
A. Yes.
Q. And did he subsequently plead guilty to other crimes following his charge with that extortion?
A. Yes.
Q. And during his guilty plea allocution, did he admit to his participation in that extortion with the

defendant?

A. Yes.

Q. Did Anthony Russo advise the FBI whether the defendant's listed -- solicited his assistance more recently to commit crimes?

A. Yes.

Q. Can you please give an example of one of those crimes?

A. In 2010, he asked Anthony Russo's assistance to extort the owner of a pizza parlor in Staten Island.

Q. Did Anthony Russo agree to assist the defendant?

A. Yes.

Q. In sum and substance, what happened?

A. They were driving in Staten Island -- Anthony Russo, Frank Guerra, were driving with Frank Ianacci in Staten Island. They stopped by the pizza parlor to see if Gene Lombardo was around. They subsequently called him out of the pizza parlor and confronted him about the fact that he was opening up a pizza parlor, using the same recipes as L&B Pizza in Brooklyn and that that was disrespecting Frank Guerra's wife's family. Frank Ianacci assaulted Gene Lombardo. They departed the area and then there were follow-up meetings to ask for compensation from Gene Lombardo for this disrespect that he showed towards his wife's family.

Q. You referenced that there were follow-up meetings. Did members and associates of the Colombo family, aside from Anthony Russo, Frank Ianacci and the defendant participate in those meetings?
A. Yes.
MR. McMAHON: Is that in addition to or other --
THE WITNESS: In addition, Anthony Stropoli was also present.
Q. And was Anthony Stropoli one of the individuals depicted in the photographs that I previously showed to you?
A. Yes.
Q. If you were called to testify -- one moment. If you were called to testify at a future hearing, are there additional facts to which you could testify in relation to your investigation of the defendant?
A. Yes.
MS. GEDDES: The government has no further questions at this time.
THE COURT: All right. Mr. McMahon?
MS. GEDDES: Your Honor, just for the record, the government does move to admit Government Exhibit 1, 1-A and 1-B which were how the draft transcripts were marked and Government Exhibits 2-A through 2-D.

THE COURT: All right. I assume there's no objection for purposes of the hearing.

(No response.)

THE COURT: Okay. They're admitted.

(Government's Exhibits 1, 1-A, 1-B, 2-A through 2-D marked in evidence.)

MS. GEDDES: Thank you, Judge.

MR. McMAHON:

CROSS-EXAMINATION

BY MR. MCMAHON:

Q. Agent Curtis, have you been trying to get Frank Guerra to cooperate with the government for a period of time?

A. I asked him on a couple of occasions to turn his life around.

Q. Well, so the answer to the question that I asked you was yes?

A. No, it wasn't for a period of time. It was on two occasions.

Q. Two occasions. Did you have occasion before coming to court this afternoon to review a memorandum that I filed at about 12:30 today?

A. No, I did not.

MR. McMAHON: Well if I might approach the witness and hand him a page of the document which is

document entry number 312 filed today and it's Exhibit A.

Q. And I would like you to take a look at that for a minute and read that to yourself.

THE COURT: I'm sorry, Mr. McMahon, you're talking about the document headed "Cooperation Contacts"?

MR. McMAHON: Yes.

(Pause.)

Q. You've had a chance to read it, Agent Curtis?

A. Yes.

Q. Is there anything on there that is factually incorrect?

MS. GEDDES: Objection, your Honor. The witness couldn't possibly opine on every single portion of the (inaudible). He can only opine on the references to what he did.

MR. McMAHON: Judge, the witness has just been led through an array of interpreting what Tommy McLaughlin meant, what Anthony Russo meant. It certainly -- this relates to contacts that he has had and I'm asking him if there's anything there that is factually incorrect.

THE COURT: Well, with respect to contacts that the agent has had, I think it's a fair question. With respect to whether or not you telephoned Ms. Geddes, for example, I don't know if the agent was there on the phone

and knew it was you. So --

MR. McMAHON: Just as to the things he knew.

THE COURT: Okay. So as to the things he knew, he can answer the question.

A. I don't remember said -- using the word "comfortable" the day --

Q. That's on --

A. -- Frank Guerra was arrested.

Q. On the day that he was arrested, did you have a conversation with his wife, Frank Guerra's wife?

A. Yes.

Q. And during that conversation, was this after Frank Guerra was taken out of the house?

A. Yes.

Q. And during that converstaion, did the subject of Anthony Russo and his wife come up?

A. Yes.

Q. And did you not, in fact, tell Mrs. Guerra that the Russo family was content in the witness protection program or words to that effect?

MS. GEDDES: Objection.

A. I don't think so.

Q. What was your purpose in bringing up the Russo family to the wife?

A. The fact that I had a conversation with them about

Anthony turning his life around and leading a legitimate life and that was my goal.

Q. All right. And when you say leading a legitimate life, becoming a cooperating witness for the United States government would be part of that?

A. Yes.

Q. Now as to the first entry, is it correct that Anthony Russo is a former business partner of Mr. Guerra?

A. Yes.

Q. In addition to being his best friend and knowing him for virtually his entire life, he was in business at the time of the arrest of Mr. Russo with Mr. Guerra?

A. Yes.

Q. And they sold soaps and other things for car washes; is that correct?

A. Car detailing supplies, I guess you would call it.

Q. Did you at 7:30 p.m. on February 9, 2011, telephone Mr. Guerra and tell him that it was his last chance to cooperate with the government?

A. I don't remember using those words but I did have a conversation with him about turning his life around. And that it was -- now was the opportunity.

Q. And that was on February 9 at 7:30 p.m.?

A. I can't remember the exact date but it was in the month of February.

Q. Well, when your telephone number, when you call somebody, does your telephone show up as a restricted number?
A. Usually not.
Q. It doesn't. It shows up as Agent Scott Curtis, FBI?
A. No, it shows up -- it shows up whatever -- with my cellular number.
Q. All right. And on February 10, the following day after you had a telephone conversation with Mr. Guerra but you don't remember what it was about, did you see in Gangland News that there was a big article about Anthony Russo becoming a cooperator and giving information on Frank Guerra about the Joey Scopo murder? Did you see that article the day after your call to Mr. Guerra?
A. I remember reading an article about that. I don't know whether it was on February 10 or not.
Q. And did you provide Mr. Capeci with that information that Russo was giving up -- supposedly giving up Mr. Guerra on the Scopo murder?
A. No.
MS. GEDDES: Objection.
THE COURT: He's answered the question.
Q. Have you ever spoken to Jerry Capeci?
MS. GEDDES: Objection.
THE COURT: Relevance?

MR. McMAHON: Well, whether he has targeted and in fact, engaged in a campaign to get Guerra to cooperate and by increasing the pressure by disclosing his name in the press, that was part of that campaign.

THE COURT: Well ask a more specific question because conversations with Jerry Capeci are not illegal. But I think he's already answered the question about whether or not he spoke to him the day of, the day after.

MR. McMAHON: All right.

THE COURT: So ask him another question.

Q. Now is it correct that Mr. Russo, he was arrested on January 20 as part of that Mafia takedown?

A. Yes.

Q. And that within ten or eleven days of that, or by the beginning of February, he had become a cooperating witness?

MS. GEDDES: Objection.

MR. McMAHON: Timing. It just goes to timing.

THE COURT: Overruled. Go ahead.

A. Yes.

Q. And then shortly after --

A. Well, he decided to cooperate. Okay?

Q. Okay. And then shortly after that was when you started having conversations with Mr. Guerra about cooperating; is that correct?

A. Yeah, the conversation that you referenced here.
Q. Okay.
A. In February of 2011.
Q. And then at some point in early February, there was a large article in Gangland about BF about and Joey Scopo and Anthony Russo; is that correct?
A. Yes.
THE COURT: You're referring to the same article you were --
MR. McMAHON: Yes.
THE COURT: -- referring to before?
MR. McMAHON: Yes.
THE COURT: Okay.
MR. McMAHON: And I think the government will stipulate it was February 10, 2011.
MS. GEDDES: I don't know the exact date but I don't object to counsel's representation.
MR. McMAHON: Okay.
Q. Now have you had conversations, after you called Mr. Russo -- Mr. Guerra, did you have any conversations with the prosecutors, Ms. Geddes, or anybody else in they United States Attorney's Office about being contacted by an attorney for Mr. Guerra and telling you to stop going to call him or see him?
MS. GEDDES: Objection.

THE COURT: Sustained as to form. I don't really understand the question.

A. After February 9 when you spoke to Mr. Guerra by telephone, were you told by a prosecutor, Ms. Geddes, Mr. Lifshitz, in the office, that they had gotten a call from the attorney for Guerra and didn't want you to contact him anymore?

MS. GEDDES: Objection as to relevance to this proceeding.

MR. McMAHON: Well, amongst the relevance is that if he's a represented party, a represented person, they shouldn't be sending an agent in to talk to him. Number two, Judge, it is my theory in terms of this bail that the government is doing everything that they can to flip this person and they put an enormous amount of pressure on him, including disregarding conversations that I had with the prosecutor, that Mr. Mari had with the prosecutor, to stop contacting him and they ignored that. And I think we're entitled to bring out that fact.

THE COURT: All right. You can answer the question. Did you have a conversation where Ms. Geddes told you not to speak to him or anyone from the government?

THE WITNESS: I recall her mentioning that she was contacted by Matthew Mari after February 17.

Q. Now you had stopped by Mr. Guerra's shop again on the 17th; is that correct?
A. It was in -- some time in February, I can't recall the exact date.
Q. But it could have been around the 17th; is that correct?
A. Yes.
Q. And you took the time to outline the potential case against Mr. Guerra?
A. Yes, I told him charges, he could be potentially --
Q. That would be a yes or a no.
A. -- facing.
Q. Okay. After outlining the case and so you told him it would be in his best interest to cooperate with the government.
A. I think the way I phrased it was it was in his best interest to turn his life around.
Q. You're not a preacher, are you, sir?
A. No.

MS. GEDDES: Objection.

Q. You're an FBI agent, sir; correct?

THE COURT: Overruled. Go ahead. He's answered it.

Q. You're an FBI agent.
A. Yes.

Q. You're not here getting witnesses for a Pentecostal church. You want witnesses to cooperate with the government and testify; is that right?

THE COURT: Sustained.

Q. Now you wanted his cooperation against Michael Persico and Danny Persico; is that correct?

MS. GEDDES: Objection.

THE COURT: Overruled.

A. I wanted him to turn his life around and cooperate, so that, you know, he could then turn his life around and move out and get out of that criminal enterprise once and for all.

Q. Okay. Did you know, sir, that -- did Mr. Guerra tell you on either his phone calls or the visits that you made to his place of employment, that if you were going to charge him, charge him and he was ready to be arrested because you wanted to charge him.

A. He didn't say that.

Q. Now do you know whether or not his attorneys called the prosecutor's office and said if you're going to arrest him, give us a call, we'll surrender him? Did you have any conversation with the prosecutor --

A. I wasn't privy to that conversation.

Q. Okay. Did you send Mr. Russo's wife, Mitzi, in to see Mr. Guerra after the conversation where you outlined

the case?
A. No.
Q. Did you know that she went in to see him?
MS. GEDDES: Objection.
A. Yes.
MS. GEDDES: The (inaudible).
Q. But you didn't send her in?
A. No.
Q. Did she report back to you after she went in there?
MS. GEDDES: Objection. I don't know how this relates to whether the defendant (inaudible).
MR. McMAHON: It relates to whether the focus of this case, if in fact everything the government wants is just this guy's cooperation. I'm going to get to the weight of the evidence later on but I want to establish the fact which this witness has trouble admitting at first, that the government is deeply interested in this guy's cooperation and that's why they went after him in the fashion that they did.
THE COURT: Well, he just denied sending in Mrs. Russo.
MR. McMAHON: But he spoke to her afterwards or he found out about it --
THE COURT: What relevance does that have? The issue is what is the government's motive? So whether

someone comes to the government voluntarily with information doesn't really go to that point that you're trying to make.

MR. McMAHON: Well, except for the fact that Mrs. Russo is the wife of a cooperating witness.

THE COURT: No, I understand that but sustained.

Q. Was Mrs. Russo in the witness protection program when she went into see Mr. Guerra?

MS. GEDDES: Objection.

THE COURT: Sustained.

Q. Did you debrief Mrs. Russo after she visited Mr. Guerra?

MS. GEDDES: Objection.

THE COURT: Sustained.

Q. Now directing your attention to the pictures that were introduced into evidence, these were provided to you by Mrs. Russo?

A. Provided to the FBI.

Q. By Mrs. Russo?

A. Yes.

Q. Do you know who she provided them to?

A. Zachary Willer (ph.), an agent on my squad.

Q. And were these the only pictures that she provided?

A. No.

Q. Other pictures?

A. Yes.

Q. Well, how many other pictures?

MS. GEDDES: Objection. This is a fishing expedition.

MR. McMAHON: No, I am curious as to how they picked out a sample of whether these are out of context in terms of the pictures that were given.

THE COURT: Well, first of all, I don't know why the pictures are relevant anyway. So you know, I --

MR. McMAHON: All right. Let me get right to the point.

Q. Is this say, a dinner party, the first picture, 2-A?

A. I couldn't tell you exactly. That's what it looks like.

Q. And, in fact, 2-B is also a dinner gathering?

A. That's what it appears.

Q. And do you know where 2-C was taken?

A. No.

Q. And how about 2-D. It looks to be in a bar somewhere. Do you know where that was taken?

A. Not exactly; no.

Q. Now do you have the transcript of the recording of April 10, 2010 in front of you?

A. No, I don't.

Q. I'll get it. By the way, do you know whether or not Francis Guerra knows the Persico family?
A. Repeat the question, please.
Q. Do you know if Francis -- Francis Guerra knows the Persico family?
A. Yes.
Q. How does he know them?
A. He knows them from being a criminal associate of theirs over the years.
Q. And how else does he know them? Did he, for example, grow up in the same neighborhood as them?
A. I don't know that.
Q. Did he go to the same grammar school as them?
A. I don't know.
Q. Did he go to the same high school as them?
MS. GEDDES: Objection.
THE COURT: No, overruled.
A. I don't know.
Q. Well, you didn't think it was significant to investigate the relationship between the Persicos and Frank Guerra?
MS. GEDDES: Objection.
THE COURT: Overruled. Go ahead.
A. The more important emphasis was their criminal conduct they were doing together.

Q. But you have pictures of Frank Guerra with one of the Persicos. Did it ever occur to you that this is somebody that he might have gone to grammar school with and high school with and been a lifelong friend his entire life? Did that occur to you?

MS. GEDDES: Objection.

THE COURT: I'll allow him to answer that.

A. The only concern of mine was that they did crimes together.

Q. Oh, what crimes did Frank Guerra do with Daniel Persico?

A. They're involved in --

MS. GEDDES: Objection.

THE COURT: Yes. Now where are we going with this? This is not part of the government's case.

MR. McMAHON: Well, they seem to --

Q. You mentioned that you had information that he was involved in two other murders, other than the murders that are charged here; is that correct?

A. Yes.

Q. He hasn't been charged with those.

A. No.

Q. And those occurred sometime in the early '90s.

A. Yes.

Q. Are you waiting for the next millennium to charge him

on those?

MS. GEDDES: Objection.

THE COURT: Sustained. Rephrase.

Q. Now you said that -- what did you say about Mr. Guerra's status in terms of organized crime. Is he a boss, a --

A. He's a proposed member of the Colombo family.

Q. Okay. And you -- I think you testified that there had been several occasions that he was proposed?

A. At least two.

Q. And as of yet, he has not been made?

A. No.

Q. And I think it was your testimony that he wants to be made?

A. Yes.

Q. Did Anthony Russo tell you that Frank Guerra didn't want to be made?

A. Yeah, at one point he voiced concern about getting straightened out.

Q. He didn't want to?

THE COURT: Who is he?

MR. McMAHON: Frank Guerra.

A. At one point, he voiced concern about getting straightened out.

Q. Now concerned about getting straightened out, is kind

of an amorphous phrase. So I tried to narrow it down a little.

A. Okay.

Q. Does the concern about getting straightened out mean he didn't want to get made?

A. No, he didn't want the law enforcement scrutiny.

Q. That would come if he were made?

A. Yes.

Q. So he didn't want to --

A. The additional law enforcement scrutiny that would entail.

Q. So he didn't want to get made because he didn't want the law enforcement scrutiny; is that correct?

A. He didn't want additional law enforcement scrutiny on him.

Q. And that's why he didn't want to get made?

A. That was a concern he raised about getting straightened out.

Q. And when was this?

A. Some time after Anthony Russo and he were out of jail, between then and 2010.

Q. Now Anthony Russo is an acting capo when he was arrested?

A. Yes.

Q. And he certainly was pushing to have Frank Guerra

made; is that correct?
A. He would have --
Q. That would be yes or no.
A. He was the one that was going to sponsor him.
Q. Was he pushing -- pushing to have him made?
A. I don't think so.
Q. Now I am asking you what did Russo tell you.
A. That he asked Frank Guerra if he wanted to get straightened out. He was put on a list which was then circulated amongst the other organized crime families.
Q. Do you have the list?
A. No.
Q. Now is it correct, sir, from your investigation of organized crime families that when somebody is proposed for membership, that if they were to decline that, they were looked upon seriously with disfavor by members of that family; is that correct, sir?
A. Not necessarily.
Q. But possibly?
A. It depends who they were and their reputation and their past participation in things with the family.
Q. So you're saying that in some instances, there would be no repercussions if he turned down the offer being made and in other instances, there would be.
A. Yes.

Q. Now if you would go to the transcript of the recording on September 25, 2009, this is Frank Guerra talking to Tommy McLaughlin?

A. Yes.

Q. And directing your attention to lines 35 through 38, Frank Guerra says:

"Frank Guerra: I don't know. Sometimes I scratch my head and say I wonder if it's fucking worth it but what am I going to do. They're going to break my balls anyway."

Does that indicate to you, sir, that he was reluctant and that he was getting a lot of pressure to do it?

MS. GEDDES: Objection. The witness can't speculate what Mr. Guerra meant.

THE COURT: Well --

MS. GEDDES: The words are what they are.

MR. McMAHON: He has spoken to Tommy McLaughlin and he was asked previously to interpret his calls.

MS. GEDDES: Based on his debriefing of Mr. McLaughlin.

THE COURT: Well based on his debriefing of Mr. McLaughlin, did you discuss these lines and do you have an understanding of what Mr. McLaughlin believed Mr. Guerra was saying?

THE WITNESS: That Frank Guerra decided that he

would get inducted into the Colombo family because the FBI and other law enforcement agencies were going to investigate him and his criminal activities anyway, whether he was a made guy or not.

THE COURT: So the reference to they're going to break my balls anyway is --

THE WITNESS: A reference to law enforcement --

THE COURT: To law enforcement.

THE WITNESS: -- investigating his criminal activities.

Q. And not from pressure from people like Anthony Russo for him to be made?

A. No, definitely not.

Q. Did you hear from any of the cooperating witnesses that Allie Boy Persico was extremely upset and angry with Frank Guerra for turning down an earlier invitation to be made?

A. Yes.

Q. And when Frank Guerra says in the last line here -- Tommy McLaughlin says:

"Tommy McLaughlin: You might as well get some type of recognition."

"Frank Guerra: I've got enough of that".

Is that correct?

A. Yes.

Q. This is not a guy who was leaping at the opportunity to get made; is that correct?
A. Well he was -- he -- his statement was the fact that everybody knows his reputation and all the criminal activities he's done in the past. He doesn't need a title to carry that reputation around.
Q. Well that's the FBI interpretation; is that right, sir?
A. That's my --
Q. One might say he's been friends with the Persicos since the '80s?
A. Yes, at least.
Q. And you're saying -- you're telling this Judge that he's engaged in all sorts of criminal activity. So there's certainly been plenty of opportunity from the '80s to 2010 to make this guy; is that correct?
THE COURT: To make him?
MR. McMAHON: Yes, to have him be inducted into the --
A. Not necessarily.
Q. I see. So something prevented them from the 1980s to 2010 from inducting him into the family, other than his refusal to do it.
A. Yes.
Q. He was in jail for part of that time?

A. Yes.
Q. How long?
A. From approximately 2000 to 2006.
Q. So if you take out that six year period from the '80s to 2010, how come he wasn't made on all those other years?
A. The Colombo family books were closed from 1991 until 2000.
Q. Right. And --
A. And he was in jail from 2000 to 2006.
Q. And how about from 2006 to 2010?
A. His name didn't come up for -- to get proposed because other people got proposed and inducted before him.
Q. Okay. And it's your testimony that the Colombo family books were closed from 1990 until 2000?
A. From approximately '91 until 2000.
Q. Well is it '90 or is it '91?

MS. GEDDES: Objection.

MR. McMAHON: Is this a --

THE COURT: I'm sorry.

MR. McMAHON: Well, he's hemming and hawing over here.

THE COURT: The AUSA tried to object and you interrupted her. So I didn't hear the object --

MR. McMAHON: I don't think she saw him gesticulating with the hands there.

THE COURT: What was your objection, Ms. Geddes?

MS. GEDDES: My objection is only that the defendant -- the witness answered the question that it was approximately 1991 -- 1991 (inaudible) approximately.

MR. McMAHON: Well I want to know how approximate. Maybe it's '95, maybe it's '97. That's what I want to pin down.

Q. How good is your memory of the books being closed?

A. From the reports I have read, it was when the Colombo war started; sometime in 1991. In January, February 2000 is when the first people got inducted after the Colombo war.

Q. But as of today, you're not claiming that he's ever been inducted into the family.

A. No.

Q. Now directing your attention to the other transcript, the Joey Scopo murder -- he is charged, by the way with two murders here, is that correct, in this indictment? The murder of Michael Devine and the murder of Joey Scopo. Let's start with Joey Scopo. He was murdered in 1993, I think it was.

A. Yes.

Q. The final casualty as they say in the indictment of the Colombo war.
A. Yes.
Q. And who were the shooters?
A. The two people who shot guns that night were John Sparacino and John Pappa.
Q. And John Pappa?
A. Yes.
Q. And how many cars were there?
A. Three.
Q. Three cars. And who was in the three cars?
A. In the one car was Anthony Russo, John Pappa and John Sparacino. In the car behind them was Frank Guerra and then in a car behind him was Eric Curcio.
Q. So Frank Guerra was not in the car with Anthony Russo.
A. No.
Q. So when Anthony Russo says on the tape that Frank Guerra was in the backseat wondering what the hell was going on with all the bullets whizzing around, he's wrong.
A. Well, he corrected himself and said he was down the block.
Q. I didn't ask you that question. We'll get to that, the correction in a minute. Was he wrong when he said

that Frank Guerra was in the backseat?

THE COURT: I'm sorry, counsel. Can you show me where -- I see. Never mind. Line 25.

Q. He was wrong; is that correct?

A. Yes.

Q. And as I pointed out in the memorandum it was actually John Sparacino who was in the backseat; is that correct?

A. Yes.

Q. It wasn't Frank Guerra.

A. No.

Q. And the shooters who were with Anthony Russo were John Pappa and John Sparacino; is that correct?

A. En route to the murder scene; yes. Departing the murder scene, John Pappa was taken away from the murder scene by Frank Guerra in his vehicle -- his sister's vehicle.

Q. I didn't ask you that. I said who -- the shooters were Sparacino --

A. But I want to differentiate that Pappa was in Anthony Russo's car to begin with and then afterward he was in Frank Guerra's car.

Q. I know you said that. I heard that before and we'll get to that. The shooters were designated to be Pappa and Sparacino.

A. Yes. Actually, just John Sparacino technically was.
Q. Okay. And they're in the car with your witness, Anthony Russo; is that correct?
A. Yes, initially.
Q. Right, driving to the scene.
A. Yes.
Q. And Sparacino fire shots at Scopo.
A. Yes.
Q. And John Pappa fire shots at Scopo.
A. Yes, not at the same time.
Q. I didn't say it was at the same time. I just said --
A. I'm trying to be clear.
Q. Okay. And Scopo died?
A. Yes.
Q. And Russo drove away from the scene while Pappa is still out on the street.
A. Yes.
Q. Is Sparacino still out on the street?
A. No.
Q. He got back into the car?
A. Yes.
Q. And so then Russo drove away with Sparacino in the backseat while Pappa's still on the street?
A. Yes.
Q. Now this guy, John Sparacino, he later got murdered,

didn't he?
A. Yes.
Q. By John Pappa?
A. Yes.
Q. And there was another car there that was driven by a fellow by the name of Eric Curcio.
A. Yes.
Q. And isn't that the car that picked up John Pappa and drove him away?
A. No.
Q. And didn't Eric Curcio get murdered?
A. Yes.
Q. By John Pappa?
A. Yes.
Q. So all you have left telling you about what happened to Joey Scopo was Anthony Russo; is that correct? I mean Pappa pretty much murdered everybody else there actually.
MS. GEDDES: Objection.
THE COURT: Rephrase.
Q. Didn't he murder Sparacino?
A. Yes.
Q. And didn't he murder Curcio?
A. Yes.
Q. And then Pappa's in jail. And the only other person around other than you claim, Frank Guerra, is Anthony

Russo.

A. The only people that are alive --

Q. Yeah.

A. -- from that murder is John Pappa, Anthony Russo, Frank Guerra.

Q. Okay. And you are only talking to Anthony Russo.

MS. GEDDES: Objection.

Q. You're not talking to Frank Guerra about the Joseph Scopo hit; are you?

A. No.

Q. Who are you having conversations with about it?

MS. GEDDES: Objection.

THE COURT: Sustained.

Q. Your information about the Scopo, what you've described as my client's role is coming from Anthony Russo.

MS. GEDDES: Objection.

A. Not entirely.

Q. Largely?

MS. GEDDES: Objection. The government has introduced the evidence it intends to rely upon today. This isn't an opportunity for defense counsel to have a full preview of the government's case.

MR. McMAHON: Well, they can't say that he's relying on other people without -- unless I can ask them

who are the other people that you're relying on? The only people that are there with Scopo, we've just narrowed it down. This is one of two murders twenty years ago. He's not talking to Guerra. He's not talking to Pappa. That leaves Mr. Russo. That's what I want to nail down. Then we'll go into Mr. Russo.

THE COURT: Well, he's conceded that he's speaking to Mr. Russo.

MR. McMAHON: Okay.

THE COURT: So we'll move from there.

MR. McMAHON: Okay.

Q. Now, Mr. Russo, when he was arrested on January 20, 2011, was facing how much time in jail?

A. Life.

Q. Without parole?

A. There is no parole in the federal system.

Q. Is he facing a possible death penalty?

A. No.

Q. Did you know about all the murders that Russo committed before you started talking to him?

MS. GEDDES: Objection.

MR. McMAHON: Well if he's relying --

THE COURT: I don't (inaudible).

MR. McMAHON: -- on Russo's word, I want to have -- your Honor to have some idea how bad a person

this is to rely on to hold my client in jail.

THE COURT: Well you can ask him a different question rather than did he know before he spoke to him.

MR. McMAHON: All right.

Q. How many murders has Anthony Russo done?

A. One.

Q. This is -- the Scopo was the only murder?

A. Yes.

Q. Was he charged with the Scopo murder?

A. Yes.

Q. And he was charged with that on January 20, 2011; is that correct?

A. Yes.

Q. Frank Guerra was not; was he?

A. No.

Q. And so going back to this tape recording -- by the way, have you gone over this conversation with Mr. Russo?

A. No.

Q. You haven't --

A. Not -- we haven't gone over the transcript with him but we debriefed him about the Scopo murder.

Q. But this particular conversation with Tommy McLaughlin, you have not --

A. No.

Q. -- gone over -- you have not sat down and played this for him?
A. No.
Q. Now as you read through this transcript and as you listen to it here in court, wasn't it clear to you that this was Anthony Russo bragging about what a bad guy he is?
A. No, I think he was bragging about how tough Joe Scopo was.
Q. Right. And that this was quite an interesting and exciting hit that he had participated in?
A. Yes.
Q. And he was providing details to Tommy McLaughlin who wasn't there about facts which Russo couldn't even have known about himself; is that correct?
A. The only fact he was unsure of, I think, was whether Joe Scopo crawled across the street after John Pappa shot him.
Q. All right. So but he --
A. That's what he read.
Q. -- told him that he did.
A. Or heard.
Q. So he's telling Tommy McLaughlin as if he actually had firsthand knowledge.
A. No. No, he clarified. He said that's what I heard.

Q. He clarified it after he initially said that he crawled all the way across the street.
A. Yeah, immediately thereafter, after he mentioned that.
Q. No, well he says on line 6, "and he still made it across the street." After that he gets questioned and then he clarifies it, "Well, that's what they said."
See that on top of page 2?
A. Okay.
Q. So he had no problems -- he didn't say when he first told him that he still made it across the street. It was only after being questioned further about the body; is that correct?
A. Yes.
Q. And he made a mistake about whether Mr. Guerra was in the backseat of his car or in a different car all together; is that correct?
A. On that one line; yes.
Q. Now Tommy McLaughlin only has one conviction?
A. No.
Q. Or you only mentioned one conviction. He has multiple convictions?
A. Yes.
Q. Is there any reason why you just mentioned one?
MS. GEDDES: Objection.

THE COURT: Rephrase.

MR. McMAHON: Well, I will move on.

Q. Now is there some reason why -- at some point in time, Russo said that Frank Guerra was there at the Scopo hit; is that correct?

A. Can you repeat the question please.

Q. Yes. At some point in time after he started cooperating in early February, 2011, Anthony Russo told you at some point in time, that Frank Guerra was present at the Scopo hit; is that correct?

A. Yes.

Q. Can you tell me how long after he started cooperating did he tell you that?

A. Shortly thereafter, whatever it was, the first time we sat down and talked to him.

Q. Now you've had probably, what, ten or fifteen proffer sessions with Mr. Russo?

MS. GEDDES: Objection.

Q. Well, are you sure that it was in one of the first interviews of Mr. Russo that he said that?

A. Yes.

Q. So it would have been in the month of February and probably early February?

A. Yes.

Q. Can you tell the Court why if Mr. Guerra is so

dangerous, you waited until August to arrest him?

MS. GEDDES: Objection.

THE COURT: I'll allow you to answer that.

A. Because we had a lot of things going on and we were trying to put all the evidence together, get a -- present it to the grand jury and get it charged.

Q. So you had a lot of things going on between February and August 18 that you had to attend to before you took this danger to the community off the street; is that right?

A. Well, the process of getting him charged, indicted, arrested, took a period of time.

Q. Did you say that you had not seen the memorandum that I filed earlier today?

A. No.

Q. The Michael Devine murder, who did that?

MS. GEDDES: Objection.

THE COURT: Well --

MR. McMAHON: What's the basis for the objection?

MS. GEDDES: The only relevant portion is whether the defendant participated in that murder. He hasn't testified beyond the defendant's participation in that murder.

THE COURT: Well tell me what the defendant's

participation in the murder is.

THE WITNESS: He was a lookout in a crash car driver again.

Q. Lookout and a driver.

THE COURT: And when you say a crash car driver, what does that mean?

THE WITNESS: That means if law enforcement would have been alerted and would have been showing up at the scene, it was his responsibility to crash into law enforcement to prevent them from apprehending the individuals that were actually doing the murder.

THE COURT: Okay.

Q. And did the individual who did the murder, was it cooperating witness Frankie Blue Eyes Sparaco?

A. Yes, he shot Devine.

Q. And did Frankie Blue Eyes Sparaco tell you that Frank Guerra was there?

MS. GEDDES: Objection.

THE COURT: Sustained.

Q. Any information that you got from Mr. Russo about the Devine shooting was what he heard; Russo wasn't there?

A. Russo wasn't there. He had a few different conversations with Frank Guerra who admitted his involvement.

Q. All right. And when were those conversations?

A. Back around, shortly thereafter, the murder happened in '92, '93 time period and then a couple of conversations recently in 2010 when rumors were going around that Frank Sparaco was cooperating.

Q. And Sparaco's been cooperating since 2007 or '08; is that correct?

A. He was moved out of a federal facility in January 2010.

Q. Now you have testified on direct examination that other cooperating witnesses provided information about Frank Guerra's criminal activities. What cooperating witnesses other than Mr. Russo?

MS. GEDDES: Objection.

THE COURT: Well if you're relying on the other cooperating witness' corroboration, then I'll allow him to answer the question. If we're just going to be relying on Mr. Russo's testimony, then we'll leave it at that.

MS. GEDDES: The government's just relying on Mr. Russo's testimony.

MR. McMAHON: Fine.

Q. Now did you investigate this pizza extortion?

A. Yes.

Q. Did you speak to Mr. Gene Lombardo?

A. No.

Q. Well --
A. We --
Q. -- isn't he John Doe Number 6?
A. I assume so. I don't know what the reference is. I didn't see the memorandum but he was subpoenaed.
Q. So, my client is indicted and you've never spoken to the victim; is that correct?
A. Yes.

MR. McMAHON: Could I have this -- if the Court could please hang on one second -- I have a copy for the Court. I will proffer that this is itself identified on the tape, a conversation between the defense investigator and Gene Lombardo, the alleged victim.

(Pause.)

THE COURT: Is there something on here, Mr. McMahon?

MR. McMAHON: It's coming.

(Pause.)

THE COURT: You don't have any objection to the news reporter getting a copy, Mr. McMahon?

(Tape played back.)

THE COURT: Is there a lot more, Mr. McMahon?

MR. McMAHON: That's basically it.

THE COURT: I mean --

MR. McMAHON: Yes, he has a slice of pizza

whenever, but that --

THE COURT: Okay.

MR. McMAHON: Nothing else of substance. Nothing further, Judge.

THE COURT: You're done?

MR. McMAHON: Yes.

THE COURT: Okay. We're going to take a break. Ms. Geddes, I have three other arraignments. I don't want to keep paying for them to sit around. So after I am finished --

MS. GEDDES: Okay.

THE COURT: Okay.

(Witness excused.)

(Off the record)

THE CLERK: We're back on the record. USA v. Francis Guerra. Back on the record.

THE COURT: Do you want to go ahead.

THE CLERK: Yes, come up, come up.

MR. McMAHON: It's the government's motion for detention, so I guess they should go first.

MS. GEDDES: Your Honor, for the reasons set forth in the government's memorandum, supported by the evidence of Agent Curtis today, the government is seeking an order of detention on grounds of danger and flight.

With respect to flight, we haven't had an

opportunity to review the package submitted by Mr. McMahon. I don't doubt that we could agree upon a package that addresses the government's concern about flight. I don't know if it's a specific package or not but I am going to focus my argument on the government's contention that the defendant poses a danger were he to be released today.

The defendant is a long-time, and very well-respected associate of the McLaughlin organized crime family, a violent organization that remains committed to earning money through crime, and an organization whose members have shown a willingness -- whose members and associates have shown a willingness to commit to use violence to earn the money for the family.

As the current charges reveal, as well as the information provided by Special Agent Curtis, the defendant himself has participated in numerous violent crimes, multiple murders, two of which he's charged with currently; the 1993 murder of Joseph Scopo and the 1992 murder of Michael Devine.

In addition to those two murders and the other murders about which Special Agent Curtis referenced, the defendant has participated in numerous acts of other violence, a violent extortion of which he wasn't convicted of in 2000, however he -- in his guilty plea,

it was deemed relevant conduct and the defendant admitted his participation in that extortion. In that extortion, they threatened an individual and I believe they actually hung that individual out of a window.

He did that crime, as he did many other crimes, with his close friend and close criminal associate, Anthony Russo, the same individual with whom he participated in the murder of Joseph Scopo, and other crimes.

In addition to that 2000 or the 1997 extortion which was part of his 2000 case, the defendant participated in loan sharking, narcotics distribution, other extortions, including the extortion of an individual who was a partial owner of The Square Pizzeria, of which there was some testimony about today. The defendant, as a result of his position in the Colombo family, his position being a respected associate of the Colombo family was able to recruit other members and associates of the Colombo family, go to this partial owner of the pizzeria and demand some type of compensation for his opening this business that in the defendant's view interfered with his family, his marital family's business. Again --

THE COURT: Well, counsel, the last thing -- I mean I know we interrupted this proceeding and I never

heard any additional follow-up, but the last thing we heard from the defendant was the tape that his private investigator made which seemed to suggest that no such extortionate activity had occurred based on an interview with the actual person who was allegedly the victim. And I am curious as to what the government's response to that tape recorded conversation is.

MS. GEDDES: Certainly. Well first and foremost, I would note that perhaps one of the few, what appear to be credible things on that recording is the fact that the victim was not willing to meet with the government. However, as a result of that, the government went out and sought additional evidence of the defendant's participation. That evidence includes while -- before the January 2011 arrest when Anthony Russo and numerous other Colombo family members and associates were arrested, Mr. McLaughlin was making numerous recordings. On one of those recordings, another associate of organized crime referenced the fact that this extortion had taken place, as did numerous other individuals that the government interviewed during the course of its investigation.

THE COURT: But the individuals that government interviewed, were they present? Did they observe it or as the victim seemed to be suggesting on the tape, as

best I could understand what was being said, that this was a rumor that had been circulating and that it never happened.

MS. GEDDES: Anthony Russo told the government that it did happen. He was present for when the defendant and Colombo family associate, Frankie Nosh, is his nickname, his real name is Frank Ianacci, went to the defendant's business or I am sorry, the victim's business and the initial assault took place. He admitted his own participation in it. Anthony Russo's information has been corroborated in numerous other respects and the fact that the victim told an investigator who himself was lying in numerous respects or in some respects, I believe, on the recording, and the government has not had an opportunity to speak with this victim, is not sufficient to -- or it just doesn't make sense. It doesn't make sense that Anthony Russo would make this up.

In addition, even on the recording, Gene Lombardo, the individual on the recording's own words were that he understood that the defendant's family was upset with him for opening up this business. He recognized or he acknowledged that there was a rumor that people were talking about the fact that there was an assault and Anthony Russo admitted his participation in that assault, as well as his meetings with other members

and associates of not only the Colombo family but other families in an attempt to resolve that. That's the government's evidence.

Based on that, the defendant has been -- that was part of the charges including in the government's -- in the indictment against the defendant.

MR. McMAHON: Your Honor, if I might start --

THE COURT: Is that it? I just want to make sure she's finished before you --

MS. GEDDES: Go ahead.

MR. McMAHON: If I might start with at the last part, I don't know why she said that the investigator lied. the investigator did say one of the things was they thought that Guerra had already been arrested, which was incorrect. It wasn't a lie. But that's the only mistake that I heard that the investigator said, the tape was made in March. But it's obvious on this recording that it was a pretty candid conversation between what was going on.

And all I can say, Judge, is it is astounding to me, and I've been at this for 32 years, that -- and my background was a state prosecutor where you don't get hearsay in grand juries like you do here. Now you can have agents go in and they basically recite a laundry list and you get an indictment. This agent testified

that -- and I assume he was in the grand jury but if not, he certainly is the case agent on the case. Somehow this indictment contains the charge of extortion of Gene Lombardo and the case agent who was called to testify here never spoke to the victim. That is remarkable.

And what's more remarkable is that we did speak to the victim. We recorded it. We played it. And they're still saying disregard what the victim said and take what Anthony Russo said; why would he lie? Well, I could think of sixty, seventy, eighty or ninety years why he would lie. Anthony Russo, close friend, best friend, of Frank Guerra is charged with murder, is facing life in jail, is charged with the murder of Joseph Scopo and he knows he's in Colombo for a long time, he knows the litigation that this office has had with Michael Persico, up and down this circuit on appeal, pending the case, the circuit orders his release on appeal. Anthony Russo knows what these people want. They want Michael Persico and they want Frank Guerra as the key to Michael Persico.

Now who does he give them information about? That's who he gives them information about. And so why would Anthony Russo lie? He would lie to get a cooperation agreement. He would lie so that he doesn't have to do life in jail for the crimes that he acknowledged, that he bragged about, all the guns, and

that bastard, Joey Scopo crawling across the street, which he didn't even see. If you look at that tape, and this is clear that this is, in addition to being whatever Anthony Russo is, he's a bit of a blowhard. He's bragging about things that are not true. He's saying -- which is not unusual that you would ever hear on a tape.

But for purposes of this case, Judge, what's remarkable is that there's four crimes, there's two extortions. They needed something recent. And then two murders that are twenty years old. One of the two extortions -- the other extortion of a marijuana dealer who is associated with I believe Anthony Russo here, you heard nothing about, but the extortion of this guy, Lombardo, never occurred -- never occurred.

THE COURT: Well, okay, let's --

MR. McMAHON: So my question is --

THE COURT: Let me just say this, Mr. McMahon. Let me just say this, okay? Assuming for a moment that I disregard the evidence on the most recent extortion --

MR. McMAHON: Yes, and then just with the murders.

THE COURT: I mean I can actually having been in this business, maybe not quite as long as you but almost, I can come up with a reason why Mr. Lombardo might not want to --

MR. McMAHON: Yes.

THE COURT: -- have wanted to say to an investigator for your client what really happened.

MR. McMAHON: Yes.

THE COURT: But obviously, I don't know. That's an issue that's going to be for trial and for the jury to determine once everybody gets in there and testifies.

MR. McMAHON: Right.

THE COURT: Putting that one aside, I still have evidence from the government based on a cooperating witness, we all know what cooperating witnesses have in terms of incentives to be truthful and not to be truthful, but I have two murders in which your client has been implicated. This is very different than the situation that faced Michael Persico --

MR. McMAHON: Yes.

THE COURT: -- in the bail hearing before Judge Townes that went up to the circuit that you've referenced.

MR. McMAHON: Yes.

THE COURT: And I also have the other difference, which is that your client has a prior record.

MR. McMAHON: Yes.

THE COURT: Whereas something the circuit

focused on, Michael Persico --

MR. McMAHON: Michael Persico did not.

THE COURT: -- did not.

MR. McMAHON: I agree, Judge. I agree.

THE COURT: So I guess my question is --

MR. McMAHON: How do I get out from that?

THE COURT: Focusing on those two --

MR. McMAHON: And I will acknowledge this, Judge, the only reason that I harp so much -- because frankly, I was shocked when the agent said he had never spoken to the guy because I only want you to look at the charges of the murder and think about the evidence that they have to support those charges.

I believe it is fair to say from what has transpired here today that all they have on the murder, all, is cooperating witnesses. There is no physical evidence. There is nothing.

So if all you have is the cooperating witnesses, that should first -- okay, now they can be telling the truth, absolutely. But we all know from experience that these are the dregs of the universe. That they are perfectly capable of lying, of committing crimes after they get their deal and they get time served and everything else. So look at it from that point of view.

I'm not saying disregard it but I am saying if all they have is cooperators, they have no ballistics, they have no civilians, they have no -- nothing. Then the question is are we going to detain the guy on twenty-year-old murders because cooperators now say that he did it or not that he did it but he participated. And I say no. And there's a couple of indicia why not.

For example, on the Scopo kid, I think it's instructive, all they have on that is that snippet of Anthony Russo putting my guy into it where he supposedly said BF, which I was unable to hear, but if your Honor did you're the one who counts. Russo says he's in the backseat and then he's in the next car.

Now the government or Curtis didn't think that, you know, it was just a little bit of a mistake. But I mean if you're recounting a murder, I think you would know who was in the backseat and who was in a different car. And in the space of a minute, if you were telling the truth or just blowing up a story for Tommy McLaughlin, I think it's likely that you would have gotten it correct.

The other thing is this, that Pappa went to trial. I put in my papers before I heard the testimony, you heard a description. You read in my papers, of who was there. I said at 12:30 that Sparacino was in the

backseat, not knowing where they were going to walk away from their tape because their tape has Frank Guerra in the backseat and in another car. So I don't know where they're coming out but I told you at 12:30 from the Pappa trial testimony that Sparacino was in the backseat and that the crash car was driven by Eric Curcio.

Now all of that is corroborated by what Curtis says. But what does Curtis tell you? He tells you that there's a second crash car with Guerra in it. Why do they need two crash cars? I'm not saying it's impossible but it's not logical. And I think the trial testimony from Pappa shows that the person who picked him up --

THE COURT: I think he just misspoke actually. I think you said Curcio says that there was a second crash car with your client --

MR. McMAHON: I meant Curtis.

THE COURT: I think you meant Russo --

MS. GEDDES: Curtis, Special Agent Curtis.

MR. McMAHON: I meant Agent Curtis.

THE COURT: Oh, you meant Curtis? Okay.

MR. McMAHON: I meant Agent Curtis. He said that there were two crash cars; one driven by Guerra and one driven alone -- each of them alone by Curcio but I put in papers at 12:30 that Curcio drove the crash car and is the one who picked up Pappa. Okay?

Now you have to ask yourself, why are there two crash cars? Maybe there weren't two crash cars.

THE COURT: I have no idea.

MR. McMAHON: But then maybe Frank Guerra wasn't there.

THE COURT: There's a lot of maybes here, counsel, but I mean I think again --

MR. McMAHON: And there's a lot of maybes. All they have is Russo saying that he was in one of the cars. They don't have anybody else or anything else. And on the word of Russo, you are going to detain him?

Judge, you know, I put in on page 5 of my memorandum because -- as anecdotal evidence but it's important anecdotal evidence, three murder cases. One of them is pending. On that Messina case, Judge Matsumoto has that $3.6 million bail, you know what's interesting? She lets him out and three weeks ago, she orders the release in a published decision of the homicide file because in connection with my motion -- there's a 1992 murder of Joseph Pistone -- unrelated to the other Pistone, I made a motion for the release of the homicide file and the government opposed it. And on their opposition, they submitted a five page Brady letter, single spaced, single line, which had the most unbelievable amount of Brady material pointing out in the

file how other people had confessed and how eyewitnesses had pointed out other people were the shooters. And in the homicide file, no mention of Neil Messina. And Judge Matsumoto in an eleven-paged decision, I think it was a blistering decision, for this homicide file not to be turned over until I had made a motion for the release of it, and for the Brady material not to be turned over until she was deciding whether to release the homicide file.

So it turns out, Judge, that Messina's charged with a '92 murder and I now have a treasure trove of information that he didn't commit it. And it's in her opinion. And the government argued to Judge Matsumoto and to Judge Levy, it's a strong case. It's rock solid. It's absolutely strong. It's garbage. It's absolute garbage.

THE COURT: But what does that have to do with this case?

MR. McMAHON: The point is this, Judge, their claim that he did the Joey Scopo murder is based on Anthony Russo. And there isn't a jury of twelve in the world that will believe Anthony Russo and convict him beyond a reasonable doubt. My guess is not a risk of danger to the community. They wouldn't have kept him out from February. I'm negotiating to surrender him whenever

they want. They want to flip him and if he's in jail, that's more pressure to flip. They want his help on his childhood friends, Michael Persico and Danny Persico.

He is not a danger to the community, Judge. All of his activity, yes, he committed crimes back then, yes he did his time back then, he is now married. He's been married for about two years. His wife and his one-year-old son are here. He was gainfully employed where they went to visit him. He's turned his life around.

And Judge, the other thing is, he did not want to be inducted. He wanted to leave the life. He got out of jail in 2006 and that was enough. That was enough. But to him -- to them, he is a tool to get Michael Persico because he's like -- that he grew up with him his whole life.

But, Judge, he is not a danger to the community. He is not a risk of flight. He is not going anywhere. And like these other people here, Judge, Carmine Polito, facing the death penalty, Judge Glasser let him out. That well-known liberal, Judge Glasser, he took a chance. He was facing the death penalty. Polito was acquitted of all charges and is making pizza in Long Island City at Bella Vita.

Judge, the fact that they say it, the fact that they have a rat that says it doesn't mean it's true and I

guarantee you a jury will not convict Anthony Russo (sic). And I don't want this guy to be sitting in jail for six months or a year while I'm doing that. He's not a danger. He is not.

MS. GEDDES: First, I want to respond to briefly, to the evidence as to the defendant's participation in the Scopo murder. It's certainly more than just Anthony Russo's word against the defendant's word. For one, on the recording from 2010, the defendant was talking to someone he trusted -- and excuse me, Anthony Russo was talking to someone he trusted, who happened to be wearing a recording device unbeknownst to Anthony Russo at the time. The defendant was one of Anthony Russo's closest friends. I've heard him described as his best friend.

It does not make sense that Anthony Russo would make up a story implicating the defendant in a murder that he didn't commit. Do sometimes people increase their roles in certain things in order to gain respect? Sure. That's not how the defendant was implicated here.

Anthony Russo admitted his participation in a murder that's corroborated, by the way, by the ballistics, what he says on the recording. He implicated himself in a murder against what one might expect one to do and implicates his best friend in that same murder.

And he says he was in the back. There is some reference to the backseat and then a few lines below he says he was in the car behind. I don't think it's material that initially there's something where he says backseat. I submit that's just him misspeaking and there's -- Anthony Russo has maintained that the defendant was in a car behind him and not in that same car.

In addition, at the trial of John Pappa, other -- as Agent Curtis testified, other cooperating witnesses made -- testified that John Pappa told them that Anthony Russo and BF were also involved. So there is corroboration for not only Anthony Russo's statements to the government after he decided to cooperate, but also for Anthony Russo's statement to Thomas McLaughlin, a person who he trusted at the time and was not aware that he was wearing a recording device. So there's certainly more than just Anthony Russo's word that the defendant participated in the Joseph Scopo murder.

And I'd also note that the defendant's participation generally in a war-related murder is corroborated by other information, including the fact that during the Colombo family war, members of the Arena faction shot at a bagel store, some type of retail store in which the defendant had an interest. The defendant was a well-known member of the Persico faction during the

Colombo family war and it's consistent that -- again, consistent with Anthony Russo and other statements that the defendant participated in the murder of Joseph Scopo.

With respect to the other cases that Mr. McMahon references, I can't speak to two of them because I don't know the facts underlying them. I can speak to Neil Messina because I'm also participating in that case. And it's a completely different case than this one. The defendant in that case was charged with a robbery that went bad in which someone was killed. The defendant here is charged with participating in the intentional murder of multiple individuals; very different from someone who participated in a robbery that went bad.

In addition -- but regardless, the government's position is that the defendant here poses a danger, were he to be released. I would also note that regardless of the defendant's sort of waiver whether he wanted to be inducted or not inducted, it didn't frankly matter for the defendant's purposes. As was stated in one of the recordings that was introduced, the defendant gets sufficient recognition by others. He's made a name for himself as a result of the crimes that he's committed and that he has a reputation for having committed.

Nonetheless, he did ultimately decide that he

was going to be inducted and was, in fact, scheduled to be inducted in December of last year, ultimately that ceremony was called off and the government has no information that the defendant is currently a member of the Colombo family.

MR. McMAHON: Briefly, your Honor, not to be labor things but the only evidence that they have other than the proffering of what Russo was telling them about the Scopo murder is this snippet of this conversation. And their answers to the fact that Russo first says he's in the backseat and then says he's in the car behind is that it was just a mistake when he previously spoke.

But if your Honor looks at that paragraph, it is not a mistake. He describes a conversation that he's having with the person in the backseat. It's a back and forth conversation. And then he gets out of the car.

So if there's anything that's a mistake, it is not this part, it's the second part because this part which is lines 24 to 28, describes a back and forth conversation and he specifically says BF was in the backseat. BF says "What the fuck are you crazy? I jumped out of the car." And this is after the shot had flew off and the bullets are flying.

So it was the backseat, what's going -- he says what's going on, are you crazy. I jump out of the car.

And that's all together -- that can't be a mistake, Judge, and yet we know BF wasn't in the backseat. We absolutely know that for a fact.

THE COURT: Well, okay. Mr. McMahon, I understand what you're saying but again, you know, this is not a situation where he is cooperating with the government at this point in time where Mr. Russo is having this conversation with the government or with someone who he understands to be cooperating with the government.

MR. McMAHON: Do you know what his motive is to put BF there? He's been pushing BF to be inducted into the Colombo family for the longest of time. Pushing. And he's trying to make BF look like a tough guy and putting him into things which he wasn't in.

THE COURT: Well then why would he then correct it and say --

MR. McMAHON: Well because --

THE COURT: -- he's in the car behind.

MR. McMAHON: Because he doesn't know what he is. He doesn't know if he's in the backseat or he doesn't know if he's in the car but he's putting him there. The point is, Anthony Russo wanted him inducted. Anthony Russo pushed for him to be inducted. He's the guy that didn't want to be inducted. Anthony Russo's the

acting captain.

So, your Honor, because they say it doesn't make it so. Mr. Modica was charged with two murders. Judge Kaplan let him out. Two murders. He's a solder, a Gambino soldier. And the idea of dangerousness for Judge Kaplan, the decisive factor was you can't tell me, the district judge, that the man is a danger to the community if you want him to cooperate and stay out and wear a wire. And if he doesn't cooperate, then he's a danger. That was the decisive factor for a soldier charged with two murders. He stayed out for the entire pendency of this proceeding. This is the Danny Marino case. He took a plea. Judge Kaplan gave him voluntary surrender to a designated institution. So those are the facts. Judge. I was his attorney. And the same thing with Carmine Polito in this district.

Judge, the charge, if it's just the charge, then there would never be bail on a murder case. But all of these people that have gotten bail, Gigante, Spero, the Mafia cops, Jackie DeRoss, all of these people -- I mean how does Frank Guerra, who is an associate, who did his time for his previous crimes and all we have on this case is the rat's testimony, how does he get detained?

THE COURT: Thank you.

MS. GEDDES: Just briefly, the government --

THE COURT: (Inaudible).

MS. GEDDES: No, your Honor.

THE COURT: Well, I am going to reserve decision. I want to consider the briefs. I want to get a transcript of the proceedings, so we can put this over -- it may take me a day or two. In the meantime, my suggestion is Mr. McMahon, in your memorandum you've listed a number of potential suretors. I don't know if that is the sum total of your package, if they are in fact the suretors that you intend to offer, but I would urge the government to at least use the delay -- I'd like to put this on, not for tomorrow but for the next day, so I have time to read the transcript.

MR. McMAHON: Interview them.

THE COURT: And use the time to interview them and make sure that you're comfortable with them, should I not find him to be a danger to the community.

MS. GEDDES: Yes, Judge.

THE COURT: And can I also have copies of the tape and the photographs?

MS. GEDDES: Uh-huh.

THE COURT: And whatever else --

MR. McMAHON: Does your Honor still have my tape recording?

THE COURT: I have yours.

MR. McMAHON: Okay.

THE CLERK: So, did you say Thursday at what time?

MR. McMAHON: Thursday, Ms. Geddes and the other prosecutors and I at 11:30 will be in front of Judge Townes --

THE CLERK: So you want to do it after that?

MR. McMAHON: -- on a status conference.

THE COURT: Can we do it in the afternoon?

MR. McMAHON: Afternoon would be good.

THE CLERK: So, Thursday, August 25 at 2:00.

THE COURT: Okay.

MR. McMAHON: Very well.

MS. GEDDES: Thank you.

MR. McMAHON: Thank you, your Honor.

THE COURT: And Ms. Geddes, you'll make sure that you put in a 475 for Mr. Guerra when he comes back to court.

MS. GEDDES: Yes, Judge.

THE COURT: Okay.

MR. McMAHON: Thank you, Judge.

(Matter concluded)

-o0o-

# I N D E X

**<u>Scott Curtis</u>:**

Direct Examination by Ms. Geddes. . . . . . . . . 3

Cross-Examination by Mr. McMahon. . . . . . . . 22

# E X H I B I T S

**<u>Government's Exhibit Marked In Evidence</u>:**

Government's Exhibit 1. . . . . . . . . . . . . . ..22

Government's Exhibit 1-A. . . . . . . . . . . . . ..22

Government's Exhibit 1-B. . . . . . . . . . . . . ..22

Government's Exhibit 2-A. . . . . . . . . . . . . ..22

Government's Exhibit 2-B. . . . . . . . . . . . . ..22

Government's Exhibit 2-C. . . . . . . . . . . . . ..22

Government's Exhibit 2-D. . . . . . . . . . . . . ..22

**C E R T I F I C A T E**

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **24th** day of **August**, 2011.

Linda Ferrara

Linda Ferrara
Transcription Plus II, Inc.