UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

MICHAEL J. PERSICO,

    Defendant.
------------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CR-147 (S-4) (SLT)

**TOWNES, United States District Judge:**

    Defendant Michael Persico ("Defendant") moves to suppress all of the evidence seized on February 7, 1991, during a court-authorized search of the offices of Romantique Limousines, Inc., a business then partially owned by Defendant. Defendant argues (1) that the affidavit which provided the only basis for issuance of the search warrant contained intentional and material falsehoods and omissions; (2) that the warrant was overbroad in that it authorized the seizure of items unrelated to the crimes being investigated; and (3) that government agents flagrantly disregarded the warrant by seizing items that they were not authorized to seize. For the reasons set forth below, Defendant's motion is denied.

## *BACKGROUND*

    On February 7, 1991, the government sought a warrant to search the offices of Romantique Limousines, Inc. ("Romantique"), located on the ground floor and basement of 6713-6717 11th Avenue, Brooklyn, New York. In support of that warrant application, the government provided an eight-page affidavit from FBI Special Agent Raymond Z. Andjich (the "Affidavit"). Since Defendant's motion questions the adequacy and accuracy of this Affidavit, this Court will describe it in some detail.

*The Affidavit*

In his Affidavit, Andjich stated that he and other FBI agents, together with agents from the Internal Revenue Service, had been investigating Defendant since September 1990. Affidavit at ¶1. They had ascertained, from undisclosed sources, that Defendant had personally loaned $100,000 in cash to one Kenneth A. Geller sometime during 1989. *Id.* at ¶2. Although the Affidavit indicated that Geller had provided information to the government regarding this loan and other matters relating to Defendant, the Affidavit did not state why Geller was cooperating.

Much of the information Geller provided related to a tax evasion scheme in which Geller was complicit. According to Geller, Defendant told Geller that he would receive invoices from Romantique reflecting interest owed on the loan. *Id.* at ¶4. Defendant further stated that any legitimate limousine services provided to Geller would be billed by a separate invoice. *Id.* Defendant "requested" that the interest payments reflected in the invoices be made quarterly via check payable to Romantique, and explained that the interest payments were being handled in this manner to divert the interest income to the books of Romantique and, thereby, enable Defendant to conceal his interest income. *Id.* at ¶2.

Geller began to receive the "bogus" invoices sometime in early to mid-1989. *Id.* at ¶5. According to Geller, these invoices differed from the legitimate invoices in that they did not contain the name of a driver and were billed to Geller's investment company, KBJS Investors. *Id.* at 7. In contrast, the legitimate invoices provided the driver's name and were billed to Geller or his accounting firm, Kenneth A. Geller & Company. *Id.* at ¶7. Geller furnished the government agents with copies of some, but not all, of the "bogus" invoices and with copies of some of the legitimate invoices. *Id.* at ¶¶5-6. In addition, Geller placed a consensually recorded

telephone call to Romantique, during which a man named "John" – whom Geller subsequently identified as the other partial owner of Romantique – explained to Geller what he owed on the invoices billed to Geller's investment company and what he owed on the invoices billed to Geller's accounting firm. *Id.* at ¶9.

At some point, Defendant told Geller that he had found a prospective purchaser for Romantique and described his conversations with the purchaser. According to Geller, Defendant told the prospective buyer not to expect the same amount of accounts and receipts, and told Geller "that there were others like KBJS Investors that would not be making payments to Romantique." *Id.* at ¶8. The Affidavit states that "Geller understood that statement to mean that there were others, like Geller's investment company, who were being sent bogus invoices from Romantique to disguise interest payments on personal loans made to them by [Defendant]." *Id.*

According to the Affidavit, Geller eventually moved his family out of their home for security purposes. *Id.* at ¶10. Thereafter, on January 29, 1991, one of Geller's associates asked him whether he had become a government witness. *Id.* The Affidavit does not indicate what Geller said in response to this question. However, the Affidavit states that on the morning of January 30, 1991, the associate asked someone else at Geller's place of business for Defendant's beeper number.

Less than one week later, on February 5, 1991, Defendant had a conversation with Geller which was consensually recorded. During that conversation, Defendant acknowledged having loaned Geller $100,000 at an interest rate of 16% per annum. However, Defendant gave Geller a $10,000 personal check to reimburse him for the interest payments Geller had made to Romantique, informed him that Romantique would stop sending invoices for the interest

payments, and promised to return the remaining $6,000 in interest at a later date. Based on these facts, Andjich concluded: "Your deponent believes that [Defendant] had been alerted to the possibility that Geller was cooperating with the government, and that he was attempting to minimize his exposure to criminal liability." *Id.* at ¶12.

### *The Warrant and its Execution*

Based on the Affidavit, Magistrate Judge A. Simon Chrein ("Judge Chrein") issued a search warrant on the morning of February 7, 1991. That warrant authorized the government to search Romantique's offices on or before February 12, 1991, and to seize:

> for the period between January 1, 1989 to the present, the following items: cash receipt ledgers, deposit tickets, invoices reflecting billing for limousine services, customer account records, relating to Kenneth A. Geller, KBJS Investors and Kenneth A. Geller and Company, dispatcher logs or other records reflecting limousine runs, computer and computer disks containing the records listed above, all of which constitute evidence of violations of Title 26, United States Code, Sections 7201 and 7206(1), and Title 18, United States Code, Sections 371 and 1341.

Attachment to Search Warrant dated Feb. 7, 1991. On that portion of the warrant which listed the items to be seized, Judge Chrein added a handwritten prohibition against searching or inspecting "any file box labelled as containing legal files." *Id.*

The search warrant was executed on the day it was issued. That search resulted in the seizure of 19 items of evidence, many of which were described in general terms on an inventory sheet prepared by FBI Agents immediately following the search. Among these items were "Romantique billing records enclosed in a manilla folder marked 'A.J. Ross'" and a "green folder marked January 1988," which contained Romantique invoices. Other items were

described only as "bills" or "records," without specifying the dates or customers to which these items related.

In addition to these records, the agents recovered a .38 caliber revolver in the top left drawer of a desk in the front room of the office. In addition, the agents recovered five .38 caliber bullets. The inventory sheet suggests that these items were found in plastic bags and that there was some indication that the gun belonged to someone named "Ross." However, "Ross" is not identified in the Affidavit or in any other documents submitted in connection with this motion.

## *Defendant's Motion*

Defendant now moves to suppress all of the evidence recovered during the search of Romantique, advancing three grounds. First, citing to *Franks v. Delaware*, 438 U.S. 154 (1978), Defendant argues that the Affidavit contained falsehoods and material omissions. Defendant primarily seeks suppression of all fruits of the search, but also seeks, in the alternative, a *Franks* hearing. *See* Memorandum of Law in Support of Defendant's Motion ("Defendant's Memo") at 6.

Second, Defendant argues that the warrant was overbroad because it authorized the seizure of items unrelated to the criminal activity alleged in the Affidavit. Specifically, Defendant argues that Judge Chrein should not have authorized the seizure of "cash receipt ledgers" because Geller stated that Defendant requested that the interest on the loan be paid by check and "there was no suggestion that Geller or anyone else unlawfully paid bills in cash." *Id.* at 6.

Third, Defendant argues that the government agents' search exceeded the scope of the search warrant. Interpreting the search warrant as authorizing only the seizure of "documents

5

relating directly to Geller and/or KBJS," Defendant implies that the agents should not have searched the entirety of Romantique's offices after discovering documents relating to Geller and KBJS in the top drawer of a particular filing cabinet. *Id.* at 7. In addition, Defendant asserts that "the vast majority of the items seized were outside the scope of the warrant," and that the agents so "flagrant[ly] disregard[ed]" the warrant as to justify suppressing all evidence in this case. *Id.* (quoting *United States v. Matais*, 836 F.2d 744, 747 (2d Cir. 1988)).

## *DISCUSSION*

### *Falsehoods and Omissions*

Defendant's first argument seeks to suppress the fruits of the court-authorized search of Romantique's office on the ground that Judge Chrein's decision to issue a search warrant was based on intentional and material misstatements and omissions. "Ordinarily, a search or seizure pursuant to a warrant is presumed valid." *United States v. Awadallah*, 349 F.3d at 64-65 (2d Cir. 2003). But, "in certain circumstances, a challenge to a warrant's veracity must be permitted." *Franks v. Delaware*, 438 U.S. 154, 164 (1978).

"One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). A defendant must, however, provide more than conclusory allegations of deliberate falsehood or of reckless disregard for the truth. See *Franks*, 438 U.S. at 171. As the *Franks* Court stated:

> [T]hose allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be

6

furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.*

"To void the warrant and suppress the evidence based on a defective affidavit, the defendant must demonstrate, by a preponderance of the evidence, that there were intentional and material misstatements or omissions in the search warrant affidavit." *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). "A misrepresentation or omission is intentional when 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'" *Awadallah*, 349 F.3d at 64 (quoting *Canfield*, 212 F.3d at 717-18). "A misstatement or omission is material if it is "necessary to the [issuing] judge's probable cause finding.'" *Klump*, 536 F.3d at 119 (quoting *Canfield*, 212 F.3d at 718). The materiality determination is made through "a process of subtraction," *Awadallah*, 349 F.3d at 64, which the *Canfield* Court described as follows:

> [A] court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant. If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate. As with the inclusion of false information, [o]missions from an affidavit that are claimed to be material are governed by the same rules. The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause.

*Canfield*, 212 F.3d at 718 (internal citation and quotation marks omitted).

"To be entitled to a *Franks* hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate

7

falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding. *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (citing *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir.1987)). "If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing." *Id.* "On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to [a] . . . hearing." *Franks*, 438 U.S. at 172.

In this case, Defendant identifies two alleged misstatements and one alleged omission. The first alleged misstatement relates to Geller's claim that Defendant told him that "others" were being sent "bogus invoices." Affidavit at ¶8. Defendant alleges that Andjich "undoubtedly knew" that this claim was false, Defendant's Memo at 5, but offers no concrete evidence to substantiate this allegation. Rather, Defendant suggests that this Court can infer such knowledge of the claim's falsity from the fact that "Andjich claimed that Geller's information was 'corroborated' by the 'monitored and consensually tape recorded conversations'" when, in fact, no such corroboration existed. *Id.* In addition, Defendant claims that because Andjich had monitored conversations in which Defendant referred to Romantique as a "legitimate" business, "there is no question that Andjich knew, or should have known, that Geller's information was not true." *Id.*

Defendant has not provided adequate substantiation for his claim that Andjich knew that Geller's claims regarding others receiving bogus invoices were false. Contrary to Defendant's representations, Andjich never suggested that he had tape-recorded proof to corroborate this

specific claim. The Affidavit states only that Andjich believed Geller to be reliable because "Geller's statements regarding *his* financial dealings with [Defendant] and others are corroborated by numerous conversations between Geller and [Defendant] that were monitored and consensually tape recorded by the FBI." Affidavit at ¶3 (emphasis added). Moreover, while Persico may have characterized Romantique as a "legitimate" business, in the sense that it provided actual limousine services, that characterization did not compel – or even permit – the conclusion that Romantique and Defendant were not involved in the tax evasion scheme alleged by Geller.

The second alleged misstatement relates to that portion of the Affidavit in which Andjich stated: "Your deponent believes that [Defendant] had been alerted to the possibility that Geller was cooperating with the government, and that he was attempting to minimize his exposure to criminal liability." Affidavit at ¶12. Defendant alleges that it was "illogical" for Andjich to reach this conclusion because, later that afternoon, John Orena – an alleged "business partner" of Defendant's – discussed with Geller payments which Geller had been making to the partner on an extortionate loan. However, Defendant provides no evidence to suggest that Defendant and Orena were aware of each other's loans to Geller, or that Defendant communicated his suspicions regarding Geller's cooperation to Orena prior to the latter's conversation with Geller.

Moreover, contrary to Defendant's assertions, Andjich's conclusion were entirely logical deductions based on the evidence set forth in the Affidavit. The Affidavit stated that on January 29, 1991, one of Geller's associates asked Geller whether he had become a government witness. Affidavit at ¶10. The next morning, the associate asked someone else at Geller's place of business for Defendant's beeper number. *Id.* Less than one week later, Defendant gave Geller a

$10,000 personal check to reimburse him for the interest payments Geller had made to Romantique, informed him that Romantique would stop sending invoices for the interest payments, and promised to return the remaining $6,000 in interest at a later date. *Id.* at ¶12. These facts amply supported Andjich's conclusion that Defendant had been alerted to Geller's possible cooperation and was attempting to minimize his criminal liability. Indeed, this conclusion was so obvious that Judge Chrein would have almost certainly reached it even if Andjich had not expressed his own opinion.

The alleged omission relates to the government's failure to state that Geller was cooperating with the government because he had been charged with running a $5 million Ponzi scheme and was seeking to minimize his own criminal liability. Citing to *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993), Defendant argues that "[w]here probable cause was based on information supplied by an informant, the 'core question' an issuing judge must consider is whether the information is reliable." Defendant's Memo at 3. Then, relying on *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993), Defendant argues that a reviewing court must consider "(1) the reasonableness of the affiant's reliance on the information and (2) whether the magistrate was fully informed of all necessary facts when the probable cause determination was made." *Id.*

Defendant does not, however, offer any evidence to suggest that this omission was deliberate or reckless. While the Affidavit did not mention that Geller was charged with a crime involving dishonesty, it implied that Geller was cooperating with the government by providing invoices and consenting to the recording of his conversations. Moreover, the fact that "Geller had moved his family out of their home for security purposes," Affidavit at ¶10, strongly

10

suggested that Geller expected a substantial benefit in exchange for his cooperation, and was not motivated by mere civic-mindedness.

Even assuming that the omission was intentional, it was not material. To be sure, evidence that Geller had been involved in a crime involving dishonesty would have been relevant to assessing his reliability. However, *Wagner* and *Smith*, the cases on which Defendant relies, involved confidential informants. This case, in contrast, involved a named informant, who was admitting participation in the tax fraud scheme at issue and whose information was corroborated both by physical evidence and recorded conversations.

"[I]nformation provided by a named informant is generally considered more reliable than information provided by an "anonymous tipster." *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 222 (S.D.N.Y. 2007) (citing *Canfield*, 212 F.3d at 719 (2d Cir. 2000). Moreover, "[i]f an informant's information has been 'corroborated in material respects, the entire account may be credited, including parts without corroboration.'" *Id.* (quoting *Canfield*, 212 F.3d at 720). Furthermore, "there is no need to show past reliability where the informant is in fact a participant in the very crime at issue" since "a confessed participant in a crime is 'no informant in the usual sense. . . .'" *United States v. Rueda*, 549 F.2d 865, 869 (2d Cir. 1977) (quoting *United States v. Miley*, 513 F.2d 1191, 1204 (2d Cir. 1975). Because Geller's reliability was established in these three respects, his reliability was not a major issue in this case. Accordingly, Andjich's failure to reveal that Geller's cooperation stemmed from his own criminal involvement, even if deliberate or reckless, was not material.

In sum, Defendant has not demonstrated, by a preponderance of the evidence there were "intentional and material misstatements or omissions in the search warrant affidavit." *See*

11

*Klump*, 536 F.3d at 119. His motion to void the search warrant and suppress the fruit of the February 7, 1991, search of Romantique's offices is, therefore, denied. In addition, Defendant has not made the 'substantial preliminary showing' necessary to be entitled to a *Franks* hearing.

***Overbreadth***

Defendant's second argument asserts that the search warrant issued by Judge Chrein was overbroad because it authorized the seizure of "cash receipt ledgers." Defendant argues that since Geller specifically stated that Defendant requested that the interest on the loan be paid by check and since "there was no suggestion that Geller or anyone else unlawfully paid bills in cash," there is nothing to suggest that these ledgers would contain relevant information. Defendant's Memo at 6.

In response to this argument, the government correctly notes that "[t]his argument takes an unreasonably narrow view of the appropriate scope of the warrant." Gov't's Opposition to Defendant's Motion to Suppress at 12. The Affidavit established probable cause to believe that Defendant was involved in tax evasion schemes involving not just Geller and his companies but others as well. To investigate these schemes, the government sought to match information regarding the legitimate services Romantique provided – as evidenced by "dispatcher logs or other records reflecting limousine runs" – with invoices Romantique issued for those services and the payments Romantique received.

The cash receipt ledgers were relevant, if not essential, to a complete understanding of Romantique's financial dealings. Although the scheme in which Geller participated may have involved payments by check made out to Romantique, other schemes may have been structured

differently. Accordingly, this Court does not find that the search warrant's inclusion of "cash receipt ledgers" rendered it overbroad.

*Scope of the Search*

Defendant's third and final argument – that the government agents' search exceeded the scope of that authorized by the search warrant – encompasses two separate parts. First, interpreting the search warrant as authorizing only the seizure of "documents relating directly to Geller and/or KBJS," Defendant implies that the agents should not have searched the entirety of Romantique's offices after discovering documents relating to Geller and KBJS in the top drawer of a particular filing cabinet. Defendant's Memo at 7. Second, Defendant argues that the agents so "flagrant[ly] disregard[ed]" the warrant as to justify suppressing all evidence in this case. Defendant's Memo at 7 (quoting *United States v. Matais*, 836 F.2d 744, 747 (2d Cir. 1988)).

The first part of Defendant's argument does not require extensive discussion. The warrant cannot be read as limiting the search to documents relating directly to Geller and/or KBJS. Moreover, even if it could, the agents were not required to end their search upon finding documents meeting this description. Since other such documents might be located elsewhere in the office, the agents were entitled to search the entire premises. *See, e.g.*, United States v. Waters, 786 F.Supp. 1111, 1119 (N.D.N.Y. 1992) (finding that an agent who was "justified in believing that . . . the subject of the search warrant could be located anywhere in the residence, outbuildings, or appurtenances thereto" had probable cause to search the entire premises.).

With respect to the second part of Defendant's argument, this Court notes that "when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." *United States v. Matias*, 836 F.2d

13

744, 747 (2d Cir. 1988) (citing *Andresen v. Maryland*, 427 U.S. 463, 482 n. 11 (1976)). Suppression of *all* evidence seized is a "drastic remedy," which is "not justified unless those executing the warrant acted "in flagrant disregard of the warrants terms." *Id.* (internal quotations and citations omitted). "Government agents 'flagrantly disregard' the terms of a warrant so that wholesale suppression is required only when (1) they effect a widespread seizure of items that were not within the scope of the warrant . . . and (2) do not act in good faith . . . ." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000).

Defendant has not met this standard. Although Defendant asserts that "the vast majority of the items seized were outside the scope of the warrant," the evidence does not substantiate this assertion. To be sure, many of the 19 items of evidence listed on the inventory of the property seized are described in general terms – *e.g.*, "billing records for 1989 to present," "Romantique records for 1990," or "pink deposit slips from 1989." Moreover, some of these general descriptions do not specify the dates to which the records pertain. However, since all of these items could have contained records within the scope of the warrant, the agent were entitled to seize these items.

Only four items – "billing records enclosed in a manilla folder marked 'A.J. Ross,'" a "green folder marked January 1988," a gun, and some bullets – appear to fall outside of the scope of the warrant. However, it is unclear whether the agents knew who A.J. Ross was, or whether he was connected in some way with Geller and his companies. In addition, the inventory sheet suggests that the folder marked January 1988 contained "Romantique invoices," which might possibly have fallen within the scope of the warrant.

14

The guns and bullets were not seized pursuant to the warrant, but pursuant to the "plain view" doctrine. "Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Since possession of a handgun is a crime in New York, officers searching for records pursuant to a warrant are entitled to seize guns and bullets discovered in plain view during such a search, even if they cannot determine at the time whether they were illegally possessed. *See United States v. Graziano*, 558 F. Supp. 2d 304, 311-12 (E.D.N.Y. 2008).

Defendant's assertion that the government agents did not act in good faith is based solely on Andjich's failure to detail Geller's criminal history and the alleged seizure of items outside of the scope of the warrant. However, as noted on p. 10, *ante*, Defendant never established that Andjich's failure to describe Geller's prior crimes was deliberate. Furthermore, as noted above, Defendant has not established that many, if any, of the items seized were outside of the warrant's scope.

Accordingly, Defendant has not made out either of the elements necessary to establish that government agents "flagrantly disregard[ed]" the terms of a warrant. *See Shi Yan Liu*, 239 F.3d at 140. Since Defendant's motion seeks the wholesale suppression of all of the fruit of the search pursuant to *Matias*, rather than the suppression and return of specific items, Defendant's motion is denied.

## *CONCLUSION*

For the reasons set forth above, defendant Michael Persico's motion to suppress all of the evidence seized on February 7, 1991, during a court-authorized search of the offices of Romantique Limousines, Inc., is denied.

**SO ORDERED.**

s/ SLT

SANDRA L. TOWNES
United States District Judge

Dated: June  / , 2012
Brooklyn, New York