UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA

            10 CR 147 (DLI)

      -against-

MICHAEL PERSICO,

         *Defendant.*

------------------------------------------------------------X


**DEFENDANT MICHAEL PERSICO'S
SENTENCING SUBMISSION**

Marc Fernich
Law Office of Marc Fernich
810 Seventh Avenue
Suite 620
New York, NY  10019
(212) 446-2346

Maurice Sercarz
Sercarz & Riopelle
810 Seventh Avenue
Suite 620
New York, NY  10019
(212) 586-4900

Sarita Kedia
Sarita Kedia Law Offices
5 East 22nd Street
Suite 7B
New York, NY  10010
(212) 681-0202

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

AN ANALYSIS OF THE SECTION 3553(a) FACTORS
DEMONSTRATES THAT A BELOW-GUIDELINES
SENTENCE IS WARRANTED IN THIS CASE.........................................................2

    A.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ...............................4

        1.  THE OFFENSE OF CONVICTION ......................................................4

        2.  UNCONVICTED CONDUCT SHOULD NOT BE CONSIDERED ....................8

    B.  MICHAEL PERSICO'S HISTORY AND CHARACTERISTICS ...........................12

        1.  A PRISON SENTENCE WOULD DEPRIVE
            MR. PERSICO'S TWO YOUNGEST CHILDREN
            OF MUCH-NEEDED PARENTAL SUPPORT....................................................13

        2.  MICHAEL'S PREVIOUSLY UNBLEMISHED RECORD AND
            HISTORY AS A HARD-WORKING AND RESPECTED BUSINESSMAN
            SHOW THAT THE CONDUCT AT ISSUE WAS ABERRATIONAL AND
            THAT A PRISON SENTENCE IS "GREATER THAN NECESSARY" ...........20

        3.  MICHAEL'S LONG HISTORY OF CHARITABLE
            WORKS AND GOOD DEEDS IN HIS COMMUNITY
            SHOULD BE CONSIDERED ...........................................................24

        4.  MICHAEL PROVIDES ESSENTIAL SUPPORT
            TO HIS FAMILY AND FRIENDS AND IS
            DEEPLY ADMIRED BY ALL .........................................................27

    C.  THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES .............30

CONCLUSION...................................................................................32

## PRELIMINARY STATEMENT

On June 8, 2012, Michael Persico pled guilty to a superseding information charging him with one count of conspiring to extend a usurious loan in violation of 18 U.S.C. § 371. At age 60, this will be Mr. Persico's first and only felony conviction. Notably, Mr. Persico has been on pretrial supervision for more than six years and has been fully compliant.

In light of Mr. Persico's history and characteristics, family circumstances and the particular facts surrounding the offense in this case, we respectfully ask that the Court impose a sentence below the Guidelines range calculated by Probation.  Specifically, we urge the Court to impose a sentence of time served in order that Mr. Persico may continue providing necessary emotional and financial support for (1) his two youngest daughters, who have already suffered the tragedy of losing their mother to cancer; (2) his elderly mother, now in her eighties; and (3) his other family members who rely on his guidance. Mr. Persico has been the girls' sole caretaker since they were 10 and 12 and to now lose him, even for a couple of years, would be too much to bear. Likewise, Mr. Persico's mother is advanced in years, suffers from emphysema and severe rheumatoid arthritis and may not survive a prison term.  Mr. Persico has no criminal history, and this was clearly an aberrational occurrence. Therefore, we respectfully submit that a sentence of time served is "***sufficient but not greater than necessary.***" 18 U.S.C. § 3553(a).

In support of this sentencing request, letters have poured in from friends, family and colleagues to provide the Court with insight into Mr. Persico's character as well as the collateral consequences a prison sentence would have.[1] One group of letters describe Mr. Persico's personal and family circumstances. Many of these speak to the vital role Mr. Persico has played as the sole surviving parent of his two daughters who, as young children, suffered the heart-

---

[1]   The bulk of the letters were written shortly after Mr. Persico's plea and are, therefore, addressed to Judge Townes.  Mr. Persico's children recently revised their letters to reflect their present situations.

1

wrenching loss of their mother after a 15-month long battle with cancer.  As the girls' only parent thereafter, Mr. Persico became literally indispensable to them, and his absence would be unbearable.

A second group of letters are written by Mr. Persico's business colleagues, many of whom have become close personal friends, to provide the Court with an understanding of his nature as a business owner and employer. It is clear from these letters that Mr. Persico has always endeavored to conduct himself in a law-abiding manner and has struggled to overcome the infamy of his last name and blood relations. A third group of letters address Mr. Persico's extraordinary good deeds and an exceptional level of commitment to his community. His generosity and philanthropy have been well documented. Finally, friends and family have written letters to express how valuable Mr. Persico is to them as he faces this very difficult sentencing day. Many of the letters are excerpted herein to illustrate specific points. The letters, however, speak eloquently for themselves. Thus, we respectfully ask that the Court consider them in their entirety.[2]

## AN ANALYSIS OF THE SECTION 3553(a) FACTORS DEMONSTRATES THAT A BELOW-GUIDELINES SENTENCE IS WARRANTED IN THIS CASE

As the Supreme Court has made clear, numerous circumstances apart from the applicable Guidelines range must be considered when imposing a sentence. *See Rita v. U.S.*, 551 U.S. 338, 347-48 (2007); *Gall v. U.S.*, 552 U.S. 38, 49 (2007); *U.S. v. Booker*, 543 U.S. 220, 245-46, 264-65 (2005); *U.S. v. Crosby*, 397 F.3d 103, 112-13, *abrogated on other grounds by U.S. v. Lake*, 419 F.3d 111, 113 n.2 (2d Cir. 2005). Although the correct Guidelines range is the starting point of the analysis (*Gall*, 552 U.S. at 49), under *Booker* and its progeny the "Guidelines are not only ***not mandatory*** on sentencing courts; they are also not to be ***presumed*** reasonable." *Nelson v.*

---

[2]All letters are arranged in alphabetical order by the author's last name and annexed as Exhibit 1.

*U.S.*, 555 U.S. 350, 352 (2009) (per curiam) (emphases in original). *See also U.S. v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005) (describing a Guidelines sentence post-*Booker* as "a benchmark or a point of reference or departure"). "Under 18 U.S.C. § 3553(a) . . . the sentencing court is required to consider a host of individual variables and characteristics excluded from those calculations called for by the Guidelines." *U.S. v. West*, 383 F.Supp.2d 517, 520 (S.D.N.Y. 2005); *see also Kimbrough v. U.S.*, 552 U.S. 85, 90 (2007) ("[T]he Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."). Thus, in addition to the Guidelines, the Court must consider the following in fashioning an appropriate sentence: (a) the nature and circumstances of the offense; (b) the history and characteristics of the defendant; and (c) the need to avoid unwarranted sentence disparities. *See Booker*, 543 U.S. at 224; *see also Rita*, 551 U.S. at 350. Indeed, section 3553(a) specifically directs that courts "shall impose a sentence ***sufficient, but not greater than necessary***, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]." 18 U.S.C. § 3553(a) (emphasis supplied).

For the reasons discussed herein, we respectfully submit that the nature and circumstances of the offense, Mr. Persico's family circumstances – including his irreplaceable role as a single father to two young daughters, his established reputation as a law-abiding and valued businessman, his history of charitable works and devotion to his community, the vital support he provides for family and friends alike, and the need to avoid sentence disparities, when considered individually and together, warrant a significant departure or variance downward from the Guidelines. *See, e.g., U.S. v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (recognizing before *Booker* that multiple factors in combination may warrant downward departure); *U.S. v. Adelson*, 441 F.Supp.2d. 506, 513-514 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good deeds he has done, and his immediate misconduct assessed in the overall conduct of his life hitherto, it should be at the moment of his sentencing when his very future hangs in the balance. This

elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").

## A.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

### 1.      THE OFFENSE OF CONVICTION

The evidence regarding the instant offense comes from recordings made by Steven Marcus, a cooperating witness since 2006. Marcus operated All Around Trucking ("All Around") with co-defendants James Bombino and Theodore Persico Jr.  Michael Persico is not heard on any of the recordings regarding the loan.[3] Rather, only the three debtors – Marcus, Bombino and Theodore – are heard discussing the loan's terms and its non-repayment.

The loan's necessity was first discussed in early May 2009, when Theodore (Michael's cousin) spoke to Marcus about All Around's need to raise capital so it could purchase more trucks and take on additional work. (5/7/09 T.) ("We'll get a loan. If we got to get a loan, we'll get a loan.")[4] A couple weeks later, Theodore again discussed All Around's need for a loan – this time with Bombino and Marcus.  He proposed: "I could borrow the money from somebody and offer them so much money. How much do you want to offer them to lend us $150,000 for two months?".  (5/22/09 T.)

On June 10, Theodore conveyed to Bombino and Marcus the terms of the loan that he had asked Michael to provide or arrange through his business contacts. Theodore explained:

---

[3] The government notes that Mr. Persico is captured on eight recordings made by Marcus in 2008 and 2009. *See* Govt. Resp. Mem. (ECF 853) at 7, n.2. But the government has not submitted them because they do not support its allegations of unconvicted conduct, nor do they speak to the offense of conviction.  Further, Marcus was not "well-known" as an "organized crime associate" (*id.*), but as a knowledgeable operator in the trucking industry.

[4]  All transcripts relevant to the offense conduct are annexed in chronological order as Exhibit 2. We will provide the audio recordings upon request.

"Every a hundred thousand that we take, we have to give back one ten." (6/10/09 T.) While the money's "sixty or ninety day[ ]" return was contemplated, Theodore made clear: "It doesn't cost ten thousand a month. It's just the ten thousand for the [duration of the loan]." *Id.* Theodore explained the loan was being given to *him* (*i.e.*, Theodore, along with Bombino and Marcus, was a borrower) and that *he* – not the lenders – set its terms, emphasizing: "Nobody's shaking us down."[5] *Id.* Marcus commented: "Perfect.... It's better than the bank, better than the bank." *Id.*

The same day, Anthony Preza, the business associate Michael had asked to extend the loan, gave the trucking company a $100,000 check. In a conversation outside Theodore's presence later that day, Bombino told Marcus: "The guy did nothing wrong to us, are you kidding me? It's a free loan." (6/10/09 T.) Marcus responded, "Exactly… That's what I'm saying." *Id.*

Six weeks later, Bombino told Marcus that in ***four months' time***, he expected to repay ***only the interest on the loan*** – not its principal – and that the company would need to retain the principal for ***another four months***. (7/22/09 T.) Approximately two weeks following that discussion, Marcus asked Bombino if Michael or anybody else had said anything about getting the money back. Bombino replied, "No." (8/11/09 T.) A month later, Marcus, Bombino and Bombino's brother Patrick again discussed the loan. (9/15/09 T.) Patrick asked if they were paying "juice," to which Bombino responded: "No, we're paying a ***flat fee***, not juice. They want 10,000 on 100,000. We pay it back, we give 'em 110, that's what they want. They never said an ongoing juice thing." *Id.* Asked if it mattered how long they held the principal, Bombino replied, "Well, they said 4, 5 months." *Id.*

---

[5] The government alleges that Theodore was a "powerful Colombo captain" and "administration member" when he borrowed the funds, while identifying Michael Persico and Anthony Preza as "associates."

At the end of October, Marcus remarked to Bombino that he was "surprised that they ha[d]n't asked for their money back" or "at least 10" for the interest. (10/29/09 T.) Bombino responded, "How could he [referring to Michael Persico]? How could he ask for it back? He knows I ain't got it." *Id.* A couple weeks later, Marcus and Bombino discussed All Around's finances, including outstanding debts. (11/11/09 T.) Referencing the interest owed on the loan, Marcus told Bombino, "Take another 10,000 off for Michael," to which Bombino replied, "Oh, yeah, the interest. I forgot.... I think Michael, honestly, I think Michael might say, 'Just give me back the money. Just pay Anthony back the money you owe him. Don't worry about [the interest].'" *Id.*

In late January 2010, more than seven months after the $100,000 loan was extended, neither the principal nor any interest had been paid. Bombino explained to Marcus that he was more concerned with his credit and reputation – his "name" – than repaying Michael's colleague, Anthony Preza:

> Michael's guy is the next order of business, before everybody else but not before the creditors and my fuckin' name. I already said that to Michael…. I said, "Do you have a problem if I give Anthony, you know, 20 thousand, 25 thousand at a time?" He says, "Well, you know, nobody wants to get money back like that, but you know, at this point, yeah, that's fine, that's fine." I says, "Okay, cause the way Testa [the company for which All Around was working] did it to me, unfortunately, I gotta do it back that way. I don't have … 100,000 to pay Anthony. So let me straighten out my name and the lawsuits and the union." … So that's how I left that. So Anthony's third after the creditors and the union. Then Anthony.

(1/22/10 T.)

As late as February 15, 2010, Marcus asked Bombino how much interest they would have to pay on the loan. Bombino responded: "I don't think I want to pay anything." Bombino then offered that Preza would "without a doubt" be happy with $10,000, adding that if he wanted

6

more, Bombino would "let Michael deal with that" since "10,000 was what [Michael] told [Bombino]." (2/15/10 T.)

Ultimately, when Mr. Persico was indicted in early March 2010, no principal or interest had been paid on the $100,000 loan; no threats, express or implied, had ever issued with respect to it; and neither Bombino nor Marcus had ever voiced any concern that harm might befall them due to their failure or delay in repayment. Notably, though the government possessed all these recordings, this loan was not initially charged but was added in a superseding indictment eight months later.

Finally, as noted in our *Fatico* brief, multiple recordings captured Bombino expressing his view of Michael Persico.[6] *See* Def. Br. (ECF 848) at 21-22 and Exs. TTT and UUU (ECF 849). In particular, Bombino proclaimed that "Michael's as squeaky clean as they come" and discussed conversations during which Michael tried to teach Bombino to behave in a professional, businesslike manner. *Id.*

In sum, the evidence demonstrates that, although Michael Persico admittedly exercised poor judgment in arranging the loan by Preza to All Around at the usurious rate that the borrowers initially offered, this conduct is far removed from the typical extortionate loan where weekly interest payments are expected and threats ensue when payments are not made.[7] As such, the Guidelines here clearly overstate the severity of the offense, and a downward departure or variance is appropriate. *Cf. U.S. v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991) (downward

---

[6] In several recordings James Bombino also discussed his and his brother Patrick's relationship with Theodore Persico. *E.g.*, 10/16/09 ("Teddy's closer to Pat[rick] than to his father."); 1/22/10 (Teddy told Bombino to give Teddy's share of company money to Patrick); 2/15/10 ("Teddy and I grew up together. I knew him all my life. He's like my brother. He's my partner.").

[7] Though we do not challenge the 3-point leadership enhancement calculated by the Probation Office, we ask that, when assessing the appropriate sentence under Section 3553(a), the Court take the enhancement into account. *See U.S. v. Kent*, 821 F.3d 362 (2d Cir. 2016).

departure appropriate where Guidelines overstated defendant's culpability); *U.S. v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995) (affirming district court's conclusion that loss amount overstated the seriousness of defendant's offense); *Adelson*, 441 F.Supp.2d. at 515 (where Guidelines not in line with severity of the offense, court should place greater reliance on Section 3553(a) factors).

## 2.    UNCONVICTED CONDUCT SHOULD NOT BE CONSIDERED

For the reasons set forth in our *Fatico* briefs, we respectfully submit that the Court should not consider for sentencing purposes the unconvicted conduct the government alleges, since it has failed to prove such conduct by any standard of judicial scrutiny, let alone one of preponderant proof. Indeed, given the benign nature of the offense of conviction, consideration of the unconvicted conduct would become "the tail which wags the dog of the [convicted] offense," *U.S. v. Gigante*, 94 F.3d 53, 55 (1996) (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)), a particularly unjust result in light of the contradictory and wholly unsubstantiated evidence presented here. *See id.* at 56 ("the weight of the evidence … should be considered with regard to upward adjustments and upward departures"). Further, no unconvicted conduct was considered in sentencing Mr. Persico's co-defendants who pleaded guilty, including Anthony Preza (charged as a conspirator in the offense of conviction), nor did the government request such conduct be considered. Thus, Mr. Persico should not be treated disparately.

Though the government argues that Anthony Russo's current testimony should be credited because (a) he had no reason to falsely implicate Michael Persico and (b) Russo's cooperation agreement incentivized him to tell the truth rather than lie, Russo's recorded statements before he began cooperating belie both assertions. First, Russo's statements show clearly his firm belief that the government wanted evidence on ***Michael*** Persico in particular and sought it from anyone willing to offer it. *See, e.g.*, Def. Br., Ex. KK and KK(T) (The feds are "***going after Michael***" and "anybody they think" is "close to him."); Ex. B and B(T) ("If you … ***tell us about Michael***, we'll have you out of here by the weekend."); Ex. LL and LL(T) ("The[ ]

8

*agents want Michael*."); Ex. MM and MM(T) (Agents pitched Teddy Persico Jr. to ***cooperate against Michael***); Ex. E and E(T) (Feds "think" ***Michael*** does "other things" because "he's the last Persico" and his "father's the boss.").  Russo does not single out anyone else as a key government target – not Theodore Persico Jr., Frank Guerra, Thomas Gioeli, Andrew Russo or Benjamin Castellazzo.  Further, the three high-ranking Colombo members who, according to cooperating witness Dino Basciano, gave Curcio the order to kill Scopo are already serving life sentences, as is Michael's brother Alphonse Persico. Thus, Russo well knew that implicating them would not provide the requisite "substantial assistance" he needed to deliver to obtain his cooperation agreement and U.S.S.G. § 5K1.1 downward departure motion.

Second, the recordings show that Russo was motivated to give the government what it wanted, whether or not it was truthful.  Indeed, Russo's pre-cooperation statements made plain his view that agents do not care whether or not a cooperator is truthful, so long as he's telling them what they want to hear. *See id.*, Ex. E and E(T) ("The [ ] feds… don't care if you're innocent." They operate like this: "If you help us out, we'll let you go," even if you "don't know nothing."); Ex. RR and RR(T) (The feds will sign up a lying "psycho" who tells them what they want to hear and will "piece it all together …[and] tell him what to say and how to say it.").

Further, the fact that Russo only implicated Mr. Persico in some, but not all, of Russo's crimes certainly does not mean he's being truthful.  As his recorded statements show, Russo well knew how to go about implicating someone falsely.  *See, e.g.*, Def. Br., Ex. E and E(T) (Russo discussing how to implicate someone in a conspiracy even if they were not involved); Ex. SS and SS(T) (Feds are telling prospective cooperators that Teddy ordered a murder from prison and Michael relayed it to others.). Indeed, because Russo knew that his limited contact with Michael Persico in recent years could readily be proven, he confined Michael's alleged involvement in Russo's crimes to the mid-1990s, save the purported valet-related interaction, which does not constitute a crime in any event. Additionally, Russo limited the crimes to ones in which Russo

9

was personally involved since, given Michael's distance from Russo, the notion that Michael would casually confess involvement in crime to Russo is exceptionally far-fetched. And tellingly, Russo well knew that the best way to implicate Michael was to simply say that he and Michael had discussions about a crime. *See id.*, Ex. RR and RR(T) ("***If [a cooperator] wants to go tell the[ ] [feds] that I told him something that I never did, there's nothing I can do about that.***").

Ironically, the government argues that Russo should be believed – despite his wholly contradictory recorded statements about Michael – but a ***different*** cooperator who disclosed that the guns used in the Scopo murder were purchased from Basciano cannot be trusted because he "***was never signed up as a cooperating witness***, [despite which] the government [ ] disclosed the statement as potential *Brady* information." Govt. Resp. Mem. (ECF 853) at 12 n.5. This is simply false. First, the FBI report itself identifies the individual providing information as a "***cooperating witness***," not as a confidential informant or other source, as it would if the witness were not "signed up." *See* Def. Br., Ex. PPP. Second, in its *Brady* disclosure, the government identified the person who provided this information as Salvatore Miciotta. Not only was Miciotta "signed up as a cooperating witness," he testified for the government at the March 1994 trial of Theodore Persico Sr. and his co-defendants (*see* Miciotta Testimony Excerpt in *U.S. v. Theodore Persico Sr.*, 92 CR 351 (Exhibit 3)) and the October 1994 trial of "Wild Bill" Cutolo and others. *See* Miciotta Testimony Excerpt in *U.S. v. William Cutolo*, 93 CR 1230 (Exhibit 4). Further, he secretly made recordings on the government's behalf from April until December 1993 (*id.* at 1631) – *i.e.*, during the time when Scopo was murdered. And critically, Miciotta testified that he purchased guns during the war from Curcio's friend and partner-in-crime Dino Basciano (*id.* at 1816), the very person Miciotta identified as having sold the guns used for the Scopo murder. *See* Def. Br., Ex. PPP.

10

The government also argues that the testimony of Alan Quattrache, a Persico loyalist during the war who testified that Michael Persico was not involved in the war or even in the Colombo family "life," should be disregarded because he did not testify about the Scopo murder. *See* Govt. Resp. Mem. at 9 n.3.  But Quattrache was heavily involved throughout the Colombo war period – indeed, apart from Scopo, all the war-related violence occurred between 1991 and mid-1992 (*see* Def. Br. at 11 n.11 and Ex. TT) – and certainly knew the others aligned with the Persico side.  He knew Michael Persico was not even involved in that "life," much less in the war – obviously a critical point.  *See id.*, Ex. UU at 1461-62, 1648.[8]

Similarly, despite having paraded a "hit list" found in an Orena loyalists' stash house as critical evidence against Guerra (*see id.*, Ex. SSS), the government argues that the absence of Michael Persico's name on it is insignificant, since other names – including Anthony Russo's – were not on the list. *See* Govt. Resp. Mem. at 9 n.3.  But law enforcement found the list in March 1992 (*see* Def. Br., Ex. RRR), when Russo was still in prison.   And more fundamentally, Michael Persico was the son of the Persico faction head.  He would undeniably have been a prime Orena target had he been involved in the "life" and the war.  Thus, his absence from the hit list speaks volumes.

Unable to even offer an explanation for the majority of Russo's contradictory testimony, the government perversely claims that the defense appears to suggest that Russo was not involved in the Scopo murder. *See* Govt. Resp. Mem. at 11. To the contrary, we emphasized that Russo was recorded implicating himself in the murder repeatedly – precisely why he cooperated.

---

[8] The government speciously argues that defense counsel suggested that the case in which Quattrache testified about Michael Persico's lack of involvement in the Colombo family life and the war was tried in 2002, since the brief inadvertently contained a typo as to the docket number. Govt. Resp. Mem. at 9 n.2.  Not only did counsel attach Quattrache's testimony showing that he testified in July 1994 (Def. Br., Ex. UU), but earlier in its brief, counsel specifically noted that Quattrache testified in Alphonse Persico's trial, which occurred in 1994.  *Id.* at 11 n.11-12.

*See* Def. Br. at 3-4 and Resp. Br. (ECF 854) at 1. As noted in our *Fatico* briefs, however, Russo's contradictions and lack of memory between even his testimony on direct and cross during both the *Fatico* hearing and the *Guerra* trial show that Russo remembered only the script he rehearsed. Def. Br. at 19 and Resp. Br. at 8. He had little true recollection of events surrounding the Scopo murder, so he invented details to make it appear as though he did. *Id.*

Finally, the government's argument that Russo's recorded observations describing Michael as "truly legitimate" should not be considered because (a) they are not inconsistent with Russo's testimony (Govt. Resp. Mem. at 5) and (b) Michael pleaded guilty to a crime (*id.* at 6) is plainly daft. No one, including Russo, would describe someone who helped plan or provided guns for a murder as "truly legitimate" or as having "nothing to do with anything" in the Colombo family, much less repeatedly complain that person had an aversion to violence. And the government's explanation that Russo did not discuss Michael's involvement in Scopo because "he could get killed for discussing murders" (Govt. Resp. Mem. at 5) is not only weak, given that he is in fact recorded discussing the Scopo murder (*see, e.g.*, Def. Br., Ex. L and L(T)), it is entirely irrational.

## B.  MICHAEL PERSICO'S HISTORY AND CHARACTERISTICS

As previously noted, the instant offense constitutes Mr. Persico's first and only felony conviction. He was born and raised in Brooklyn and has resided in New York his entire life. He is the father of five children – two young daughters, JoyceAnn and Patricia, whom he has raised alone since they lost their mother to cancer at ages 12 and 10; a son, Michael Jr., and daughter, Carmen, from an earlier marriage; and a step-son Joseph. Michael also has two grandchildren – Kylie, age 2, and Michael III, a newborn baby. Michael's two youngest daughters live with him and are enrolled in college. He continues to provide both with necessary emotional stability and financial support.

As reflected in the numerous letters submitted herewith, Mr. Persico has endeavored to lead his life in an honest, law-abiding fashion and to overcome the stigma of his last name. For the reasons discussed herein, we respectfully ask that he not be unduly punished for the lapse in judgment that led to the offense of conviction here.

### 1.   A PRISON SENTENCE WOULD DEPRIVE MR. PERSICO'S TWO YOUNGEST CHILDREN OF MUCH-NEEDED PARENTAL SUPPORT

Numerous courts in this Circuit have considered family circumstances and the need for the defendant's presence as the basis for a below-Guidelines sentence. *See, e.g., U.S. v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (court implied that extraordinary family circumstances alone may justify a downward departure); *U.S. v. Alatsas*, No. 06 CR 473, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (court noted defendant's good relationship with his wife and three children when imposing a below-Guidelines, probationary sentence); *U.S. v. Aristizabal*, No. 07 CR 101-01, 2007 WL 4555900, at *2 (E.D.N.Y. Dec. 20, 2007) (court imposed below-Guidelines sentence based in part on defendant's "good relationship with his wife and children" whom "he has been trying to support"); *U.S. v. Kon*, No. 04 CR 271-03, 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) (in imposing below-Guidelines sentence, court noted defendant's extraordinary family circumstances in that she was the only caretaker for her daughter); *U.S. v. Gamez*, 1 F.Supp.2d 176, 184-85 (E.D.N.Y. 1998); *U.S. v. Handy*, 752 F. Supp. 561, 564 (E.D.N.Y. 1990) (downward departure based on the effect of prolonged incarceration on the future of defendant's children).

Even when the Guidelines were mandatory, the Second Circuit routinely upheld a district court's imposition of a below-Guidelines sentence based on extraordinary family ties and relationships. *See, e.g., U.S. v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (Court upheld downward departure based on family circumstances where the family was "close-knit" and its stability depended on the defendant's continued presence); *U.S. v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir. 1990) ("family ties and responsibilities" warrant a downward departure).

13

Further, as discussed above, a court no longer needs to find the circumstances of a defendant's situation extraordinary but has the option of imposing a below-Guidelines sentence without finding specific departure grounds. *See, e.g., U.S. v. Selioutsky*, 409 F.3d 114, 119-20 (2d Cir. 2005) (case remanded for findings as to whether a departure or non-Guidelines sentence should be imposed based on defendant's aged parents' needs). Thus, courts may downwardly depart or vary below the Guidelines to reduce a sentence for the family's benefit when the absence of defendant's emotional or financial contribution would cause them significant hardship.

Particularly compelling in Mr. Persico's case are the needs of his two youngest daughters, Patricia and JoyceAnn, who have already suffered irreparably after losing their mother Darlene to cancer at such a young age. Those present during this horrific ordeal recall the endless love and support Michael provided to Darlene and their children. Dr. John DeLuca, Michael's family physician, notes: "During Mrs. Persico's illness, Michael was a compassionate, caring and loving husband to his ailing wife; at the same time he never wa[]vered from his duty as a father to his two young daughters, especially after the death of their mother." Rosalind Innucci, a close family friend for 20 years, writes: "When Michael's wife … became ill … Michael was her rock. He took care of her like you would care for a baby. I watched him carry her when she was too weak to walk. He was always attentive, always kind and compassionate. He spent days and hours by her side until she passed." Gina Caleca, Michael's close friend for over 30 years writes: "When [Michael's] wife Darlene got sick … he had to be the most devoted man I could have ever imagined. The way he took care of her at home is a testament to the kind and loving man he is…. [H]is strength for his family was remarkable." Michael's mother-in-law, Patricia Rava, who suffered a parent's worst nightmare – the loss of a child – describes her view of Michael: "In 2005, my daughter Darlene took ill. Michael took care of her throughout her

14

illness. He was compassionate and loving to my very sick daughter. He never left her side for a year and a half. I know, because I was right there beside him."

After Darlene's death, Michael was forced to cope with the loss of his life partner while simultaneously being thrust into the role of a single father to his two young daughters. One can hardly imagine a more painful age for the girls to lose their mother, and Michael became their emotional support system in addition to their caretaker. Although the girls, 21 and 23, are now entering young adulthood, the trauma of their mother's death is still acutely felt and has caused them to have a profound emotional attachment to their father. Michael's longtime friend and neighbor of more than 40 years, Ronald Beiter, comments: "After the loss of Michael's wife to cancer … everyone was concerned for Michael and his family. Not only did he show pure strength during his wife's battle, but again afterwards for his children. Michael was a great husband and is a wonderful father." Rosalind Innucci recalls, "When [Michael] became a single parent, he was always available for the needs of his [two] daughters. He took on the challenge of raising them without any complaints…. I find Michael Persico to be of the finest character."

Michael fully embraced his role as a single father and devoted himself to properly raising his two daughters. JoyceAnn, the older of the two girls, explains the fear of losing her father after the devastating loss of her mother:

> It [ ] became the sole job of my father to care for two young girls. Me being 12 and my sister being 10 years old, it was the toughest time of our lives. My dad had to do it all alone, make a living and make a home. As hard as it was, being under the great amount of stress he was under, all while still grieving, there wasn't a moment where my dad gave up. He still took care of us. He drove us to school every morning, dropped us off lunch, took us to our friends' houses, etc.
>
> It has now been ten years since we lost my mother, and the pain is still strong as ever. We will truly never get over the loss of her, and I can't bear to have to lose another parent. My father is the only parent I have. Although I am getting older, it is never fair to

15

have to be left without parents – one taken way too soon and one taken when he is needed the most.

Letter of JoyceAnn Persico.  Further revealing her deep emotional bond to her father, she adds: "I don't know what I would do or where I would be if it wasn't for my dad…. [He] means everything to me."

Michael's absence would deprive his daughters of the positive parental guidance that is essential during early adulthood, when the support of a loving parent is vital to fostering confidence and independence. Michael's oldest daughter expresses this concern for her sisters: "I [ ] think about my poor younger sisters all the time.  They have already experienced so much loss at such a young age.  My father took care of them and raised them since they were little, but they are still at very young impressionable ages and need him in their lives. They are still learning right from wrong.… My sisters need a parent around; they need my father there to help them and guide them to become the strongest, most positive, and successful women they can be." Letter of Carmen Persico.  Her brother Michael Persico Jr. echoes this anxiety: "Both of my younger sisters lost their mother at an early age, and I feel that their development and transition into full adulthood is still extremely fragile, and they most definitely need the security and guidance of their father."

It is no surprise, then, to hear those fears expressed in the poignant words of Michael's youngest daughter, Patricia:

> My father is the most influential person in my life.  To say my father has been a best friend to me is an understatement, he is truly a blessing….
>
> I was only ten years old when my mom passed away. Although I was young, I remember every moment like it was yesterday. I watched my father do everything in his power to help my mother feel like she was not alone in her battle with cancer. The day she passed away was the absolute worst day of my life. I remember thinking I'm ten years old now; this is going to be a very long life

16

> without my mom…. I truly thank God for the type of person my father is because I know I wouldn't have made it through without him.
>
> ***
>
> I still have so much more growing up to do, and I need to be able to go to him for everything…. I know from experience the relationship I have with my dad is rare. It scares me and kills me inside thinking that I might not be able to go into the living room and be with the one person who got me through all these years. Time is so precious and I have seen how short life is first hand. I truly need my dad every single day, just the thought of him being away physically hurts my heart.

Letter of Patricia Persico. Patricia praises her father as "the smartest, best, kindest man" and "the only person [she] ha[s] ever wanted advice from." She knows and recognizes that "[e]verything [she] learned from him was by example and experience."

Patricia's and JoyceAnn's closest relatives reiterate their worries if he were absent from their lives. As Michael's mother writes: "[Michael's daughters] are both at the age where [Michael's] support and guidance is important and necessary in their life." Letter of Joyce Persico. The girls' maternal grandmother remarks: "Michael is one of the best dads I have ever known….[H]e does everything for them…. Michael is … raising his children to be good, honest and decent citizens." Letter of Patricia Rava. She expresses the "great impact" Michael's presence has on them. Michael's sister Barbara writes: "[Michael's daughters] are both in school and very good students all because Michael is doing a great job raising them.  It is very important for these girls to have their dad around to help them continue the path they are on…." Letter of Barbara Piazza. Reflecting on her experience as a New York City public school teacher for over 20 years, Michael's sister Susan notes: "As an educator, I unfortunately see families torn apart for many different reasons. When this happens, I see grades drop and these children often give up on life. It would be a shame for this to happen to Michael's children who have their whole lives ahead of them." Letter of Susan Spata. She continues: "Michael is a terrific father

17

and a good person. He should not be taken away from his children." *Id.* Michael's daughter-in-law, who lost her father at a young age and perhaps understands the severity of the situation best, explains: "I know what my two younger sister-in-laws … face on a daily basis having a deceased parent…. They need [Michael's] guidance and support as they make essential decisions in their lives…. He is a role model and care taker for these girls." Letter of Tara Persico.

Michael's extended family members have also witnessed the special bond he has with his youngest daughters. His nephew Thomas Lippolis writes: "There isn't much left for [Michael's daughters] regarding family and they will need all the support they can get from their only remaining parent who has always loved and supported [them] through[out] every aspect of their childhood." Michael's brother-in-law James Mannino likewise expresses: "I truly hope you [will] take into account Michael being a single parent [whose] daughters … truly need his loving guidance … when you make your decision."

The girls' emotional connection to Michael is so evident that even many of his friends voiced concern for their welfare if he were taken away. Mary Kosta, who has known Michael his entire life, notes: "The importance of a father's role in his daughters' lives is irreplaceable at any point during development. It is also crucial now during … the transition into young adulthood." Reiterating this concern, Louis Bonino, a friend of over 35 years, writes: "Since their mother passed away, Michael is both father and mother to their children. They would be devastated without their father. Michael is always working very hard to help his family…. I hope before you sentence him, you think of his children and family." Cecilia Yulo, an attorney and friend for over 30 years, credits Michael with having "raised [his daughters] to be kind, considerate, and respectful toward others," adding: "He has worked especially hard to be both father and mother to his two young daughters…. He has been everything to them."

John DiLeo, whose children attended school with Michael's youngest daughter, explains: "I'm concerned about the effect any prison time will have on his children, especially his younger

daughters. They have already lost a parent and not to have their father close to them will be devastating…. [N]o one can take his place." James Donofrio, a friend for 25 years, writes: "[Michael's] relationship with his late wife, who passed away far too soon, and his two children, has been exemplary. He always put his family first, even before any personal goals or aspirations…. [Michael's] children need a father, especially since their mother is no longer with them to provide the love, stability, and guidance that is essential to their development. A long prison term for Michael [ ] may prove unduly traumatic for his children."

As his friend for more than three decades, Georgette Flecha reflects: "I've always known [Michael] to be a loving, caring devoted father to his children. It has been especially hard for them all since [the] passing of their mother…. I believe that any jail time … will be a tremendous hardship for his children." Gina Caleca likewise expresses: "JoyceAnn and Patricia are too young to be left without a hands on parent…. They really need their dad.  Please consider them when you are imposing a sentence." Margaret Maliga, Michael's employee for over 15 years, writes: "If Michael gets sentenced to prison, it will be very devastating, heartbreaking and painful for everyone that knows him but most of all to his daughters. They already lost one parent so please don't let them lose another one." Theresa Fearon, a longtime friend and business associate, similarly comments: "[Michael's] girls need their father even more so than other children would because they are without their mother. As a parent in that situation … I know they will be devastated without him."

Other long-time friends attest that Michael has been nothing short of an exemplary single parent. Friends who have known Michael since birth observe: "Since the death of [Michael's] wife, he has dedicated himself to his children, striving always to be both Mother and Father to them." Letter of Joan and Joseph Guido. John Barese, a friend of more than 20 years, writes: "Michael's strength as a single parent is admirable and inspirational to all. He realizes his daughters are most important and has always accepted his responsibility lovingly and willingly."

19

David Fine, Michael's friend and a father to two teenage sons, describes Michael as "[a] great friend, a loyal family man, and most important[ly] one of the best fathers I have ever had the pleasure of meeting." Dr. Michael Giasullo, Chief of Urology at Lutheran Medical Center in Brooklyn, observes: "I frequently see Michael … with his children and always comment to my wife about what a wonderful job he has done as a solo parent." A close friend of over 40 years describes Michael as "a good provider for his children, the best role model, [and] a great Father…. His children love him." Letter of Frank Leone. Rino Aprea, who has known Michael for nearly 30 years, likewise calls him as "a wonderful father who is a hands-on dad [and] always there for all his children no matter what he is going through." Michael's cousin Annette Iacono mirrors this sentiment: "[Michael] is a good and decent person but more than that he is a hand[]s on Dad who cares for his wonderful daughters."

2.    **MICHAEL'S PREVIOUSLY UNBLEMISHED RECORD AND HISTORY AS A HARD-WORKING AND RESPECTED BUSINESSMAN SHOW THAT THE CONDUCT AT ISSUE WAS ABERRATIONAL AND THAT A PRISON SENTENCE IS "GREATER THAN NECESSARY"**

Mr. Persico has been steadily employed in numerous businesses throughout his life. He has owned a coffee business, several restaurants, a car service business and has worked diligently in each of his undertakings to make them successful establishments with favorable work environments. He now manages his real estate holdings, a full time task. Through years of hard work and dedication, Michael has earned a reputation as an esteemed and valuable member of his business community, and those who know Michael best recognize the conduct at issue here to be aberrant. Theresa Fearon, who works in the wedding industry and had numerous customers in common with Michael when he worked in the car service industry, writes: "Michael is a very good businessman and [is] always [ ] spoken about in the highest regard[ ] in our industry." Dr. Michael Giasullo, who has known Michael for more than a decade, comments: "[Michael's] reputation in the community [is] that of a prominent businessman with the highest ethical

standards…. He ha[s] chose[n] to lead a life of honesty, integrity, and hard work." Joseph Hommel Jr., a business associate and close friend for over 20 years, notes: "[Michael] is known as a caring, but strong businessman by many and highly respected in our town…. For as long as I've known Michael, I continue to view him as an honest, upstanding man who strives for the best." Ronald Beiter also describes Michael as a "well established and respected family and business man." Vincent and Lorraine Blandino, friends of Michael for more than a decade, describe Michael as an "intelligent businessman" and "fine gentleman" whom they feel "extremely fortunate to have met."

Michael's demonstrable commitment to living a law-abiding and productive life, despite his last name and family ties to illicit activity, has earned him the admiration of friends and colleagues, who routinely describe him as intelligent, honest and hard-working. Donna and Robert Ottofaro, who have known Michael his entire life, write: "[Michael] is his own person, not a product of his family's past…. [He is] a kind, gentle and smart man with a warm smile and [ ] always ready to lend an ear. He helps support his community and neighborhood." Michael's close friend of many years Jennifer Patafio writes: "Born to a name that prejudiced and scrutinized [Michael's] every move … [h]e quietly took the high road and became a man I hope someday my own son will emulate. Hardworking, loving, caregiver, loyal, honest and respectful, these are the words that describe a great man." Linda Lippolis, Michael's sister-in-law, laments: "[U]nfortunately the reputation of other family members may now suggest the tarnishing of Michael's good name. [However, Michael has] prided himself as a businessman and a law-abiding citizen."

Those who have worked and interacted with Michael professionally similarly attest to his honorable character. John Manning, a mortgage broker in Brooklyn, recounts: "I have done business with Michael Persico on several occasions over the past few years. I have known him to be nothing other than polite, professional, and courteous to myself and my staff. He has always

21

been honest and forthright with me." Howard Simowitz, Michael's longtime accountant, comments:

> [Michael] has earned my respect, both as a professional and as a friend, in the manner that he has handled all aspects of our relationship…. He ranks with the best that I have met and I have been fortunate to meet some very kind, honorable and successful people in my lifetime.

Roy Brigagliano, a certified public accountant who also handled Mr. Persico's financial affairs for several years, states: "[Michael] has been held in the highest esteem by those who have come into contact with him[,]" noting that "[h]e has been audited by the IRS and has proven to be law abiding in his tax filings." Angelo Corva, an architect who collaborated with Michael on several projects describes Michael "as a fine example of a law-abiding[,] kind [and] caring gentleman" and "commend[s] him for his outstanding qualities and fine character." Michael Miranda, a friend and business associate of Mr. Persico for over 20 years, likewise characterizes him as "an honorable businessman, loyal friend, and loving family man… [who] has always tried to live his life in accordance with the law."

So too, Michael's close friends unequivocally describe him as a hard-working and upright citizen. Louis Bonino, a retired NYPD officer who has known Michael for nearly four decades, comments: "Michael has never been in trouble before and has always led a peaceful li[f]e. Michael is one of the most decent and respectful people I know." Joseph and Faith Trunk, who have known Michael since he was a teenager, write: "I hope you take into consideration the way in which [Michael] cares for people and for his life's past record being a law abiding business man and family man…. He is loved and respected by many people from all walks of life." Long-time friend Rino Aprea similarly writes: "Since 1988 I [have] only know[n] Michael to be a law abiding person whom I have spent a lot of time with. Michael has always made clear that he is a person who lives according to the law…." Marilyn Caruso, a neighbor and friend of 30 years, notes: "Michael has always tried to live his life in a law-abiding manner and has always

encouraged others to do the same. Michael possesses a great deal of integrity and constantly strives to make sure he is doing the right thing." Another longtime neighbor and friend comments: "I have [ ] known Michael to be a concerned, law-abiding citizen, contributing to the community. He has always acted in 'upright' fashion." Letter of Mary Anne Marullo. Dino Iacuzzo, Michael's close friend of nearly 20 years, likewise conveys: "Michael has continuously expressed remorse over any involvement with those events charged. It was an aberration of character[.] Michael is one of those good men who went to work everyday, raised a family and lived his life. He is an honest man who made a mistake."

Not only is Michael an admired businessman, he has also served as a role model and supporter for employees and colleagues.  Michael LoDolce, a business associate and friend for 25 years, describes Michael as "a local business man providing jobs and a good working environment for his employees." He continues: "Michael's friendship, advice and mentoring has [ ] had a positive impact on the decisions I have made in regards to growing the business and treating our employees with respect and appreciation. I can't say enough about his character and fabric as a compassionate person." Rino Aprea also views Michael as a role model: "Michael is a great inspiration in my business ventures, watching him … and listening to how he would constantly try to better them or better his workers so that they could one day open or run businesses of their own. Four of his employees to this day … have their own businesses." Steven Caso, who owns several businesses in Brooklyn and has known Michael for many years, describes "what a positive influence [Michael] has had on the community whether [ ] it[']s serving the community through his business or by creating employment opportunity for fellow members of the community." Mr. Caso continues: "I have several businesses in the area and Michael has always been a positive influence in his willingness to grant advice as well [as] to be supportive and lend a helping hand to everyone in the community…. He has always conducted himself, both professionally and personally, with the utmost character and integrity."

23

Michael's employees similarly praise him as a man of high character. Margaret Maliga writes: "In all the time I've known Michael, I've never seen him display any act of anger or aggression to myself or any other of my co-workers…. He's not only a great boss but an excellent businessman, a wonderful friend and a great father." During the 10 years that Rosario Ferrara worked for Michael, her relationship with him was "warm and hospitable." Ms. Ferrara describes Michael as an employer who was always "fair and honest[,]" not "given to anger," and nothing but "respectful and reserved."

Michael has even made financial sacrifices in order to help colleagues in need. Joseph Hommel Jr., who purchased a floral business from Michael, writes: "[Michael has] always stressed his desire to see us succeed. Michael always understood if a payment was not made on time and would not accept any interest. To this day I am grateful for his offer and assistance in supporting a business that has helped me and my family grow."

### 3.   MICHAEL'S LONG HISTORY OF CHARITABLE WORKS AND GOOD DEEDS IN HIS COMMUNITY SHOULD BE CONSIDERED

Michael is widely regarded as a generous and valuable contributor to his community. Retired NYPD officer Louis Bonino writes: "Michael has always tried to help people in both business and their personal lives. Michael does not know how to say no when it comes to helping others." Mary Kosta likewise notes: "I have known Michael his whole life…. Michael is a caring, thoughtful person who always goes out of his way to help others. He is a gentleman [ ] and [ ] an asset to the community." Barry Levin, an attorney who has known Michael for more than 20 years, comments: "I have always known Michael to be a generous and charitable person who is always available to help."

Charles Marullo, a retired New York City school teacher who has known Michael for 15 years, describes him as "a contributing factor to our community [who] has always acted in a respectable manner." Other close friends also describe Michael's genuine concern for and active

participation in his community. *See, e.g.*, Letter of Perry Ferrara ("Michael is a good person. I have seen him do so much for so many."); Letter of James Donofrio ("Mr. Persico has always tried to help people in need…. He [has] always [been] a community oriented man who [gives] generously of himself for worthy causes.").

After enduring the tragic loss of his wife to cancer, Michael committed fundraising efforts to support medical research in the hopes of sparing other families from suffering similar hardship. Steven Caso recalls: "I have personally witnessed [Michael's] charitable nature and genuine compassion by attending charitable events held by Michael to raise money for cancer." Recognizing Michael's commitment to cancer research, Donna Guiga, a registered nurse who has known Michael for 25 years, often sought his assistance with fundraising efforts: "[W]hen I turn to [Michael] for [] help whether it is financially or just giving of his time, he never refuses. He always comes from a place of yes[,] never no…. He is truly an asset to his family, friends and community."

Michael has also served his community through his work with young children who are underprivileged or have special needs. For years he was actively involved in the GRACE Foundation of NY, a non-profit that helps children with autism and their families. Kathleen Tramontana, a board member and chairperson of GRACE, writes: "Michael was always there to help in any capacity he [could]. Whether it be giving me his time, helping with the organization or running such an event, or donating gifts and funds[,] it did not matter…. His kindness, compassion and honesty [were] always apparent." Several lifelong friends also describe Michael's charitable work over the years.  Peter Thristino writes: "Michael [ ] unselfishly offered his time and services to the community[,]" recalling that "[Michael] volunteered to assist the Community Mayors with the handling of handicapped children at special events." Florence Della Rocca writes about how "[Michael] manages to thanklessly give [ ] his time and considerable amount of energy to help in the nurturing and development of underprivileged young children."

25

Georgette Flecha, who is involved with several charitable organizations, notes: "[Michael] has been an asset to some of the charitable work I am involved in[.] [H]e has contributed significant[ly] to Toys for Tots during the Christmas holidays [and] has supported [m]any charitable organizations with time and donations, to help those less fortunate."

In addition, Michael has always recognized the importance of sharing personal financial success for the betterment of the community. Ronald Beiter reveals that: "Michael is known as a 'philanthropist' in the Saugerties community. Always giving and NEVER expecting anything in return." Several friends recall generous acts that were done simply to uplift his community. For example, Louis Soto comments: "I have seen how Michael puts the needs of others before his own which is evident through his substantial endeavors to community work, in particular our elementary school children. He dedicated many things including a new scoreboard that the school so longed for but could not afford to purchase." Michael has also received numerous notes over the years thanking him for his assistance to various children's organizations. *See, e.g.*, Letters of Charles and Rosane Farcher.

Noting the support he has shown for his church, Michael's friends and fellow congregants write: "Michael [is] always there to offer his help one way or another…. In a fundraising campaign to memorialize Christmas trees, Michael, without hesitation, donated ten live Christmas trees [ ] which are still in front of the main entrance to the Rectory." Letter of Vincent and Lorraine Blandino. *See also* Letter from Atonement Lutheran Church.

Michael has selflessly helped both friends and strangers alike. Paul Dordal, who met Michael after spending time in prison, writes: "[Michael's] faith, trust and business acumen took me from an uncertain path to a road with direction and purpose…. Michael's offer and generosity of being a working partner allowed me to reconcile my life and that of my family." Rocky Armacida, a friend of Michael's for many years who has struggled with various health issues, recounts: "Michael [is] always caring, charitable and generous helping anyone in need….

26

With his financial support and asking nothing in return I was able to get off disability and go back to work."

Undoubtedly, Michael's community would suffer a great loss in his absence. As Nicholas DiLeo, a business associate and friend of Michael's, writes: "In thirty years I have never witnessed Michael turn his back on anyone that needed some type of assistance or advice. These are qualities of a giving and kind person, a quality that will be greatly missed if he is absent." In light of these attributes, Michael's brother-in-law Robert Lippolis asks that "the [C]ourt take into consideration the positive effect that [Michael] has [had] on the many lives that he [has] touche[d], and the void his absence would create."

### 4.    MICHAEL PROVIDES ESSENTIAL SUPPORT TO HIS FAMILY AND FRIENDS AND IS DEEPLY ADMIRED BY ALL

In addition to raising his two daughters since preadolescence as a single father, running several businesses and serving his community, Michael also plays a vital role in the lives of his friends and relatives.  Alvin and Joyce Green, who have known Michael his entire life, write: "Michael's [] family members rely heavily on Michael's presence…. Michael is the caregiver for not only his children, but for his mother, sister and brother, as well."  Michael Miranda likewise observes: "[Michael's] guidance, leadership and financial support are crucial to his family's survival. He has been supporting his mother and siblings for many years. He is fully committed to providing for all members of his family." *See also* Letter of Marilyn Caruso ("[Michael] has been an integral part in the caring of his mother and family members."). In summarizing how Michael prioritizes support of his family, attorney Barry Levin writes: "[Michael] is a person that always puts his life last and spends most of his time raising his children, assist[ing] his nieces and nephews and helping his family and friends."

If Michael were absent for any period of time, his family would certainly suffer. MaryBeth DiLeo, who has been friends with Michael for more than 20 years, writes: "I'm

concerned about what might happen not only to [Michael's] children, but his mother and other family members as well…. He is the one who takes care of everyone else.  There's always a person who family members seem to count on more than others for support and advice and Michael is that person in his family." Indeed, Michael also provides support to his former wife, the mother of his two older children, Michael Jr. and Carmen. Michael's son writes: "I am [] concerned for my mother as she is disabled and depends on my father's support. As well, my Grandmother, my father's mother, is [in] her eighties and needs [his] support too." Letter of Michael Persico Jr.  Michael's sister-in-law notes that, in addition to "two young daughters who already ache from losing their mother to cancer," Michael's "elderly mother depends on him [and his] absence will weigh heavy on her well-being." Letter of Linda Lippolis.

Michael's older children also speak of how important he is in their lives and the lives of his grandchildren. Michael Persico Jr. writes: "The coming years … seem unclear and dark as my father's guidance, which has always been an integral part of my development, may be absent. My father has always guided me in the right direction."  Carmen Persico similarly explains her need for her father's guidance, especially during times of trauma and uncertainty: "Without my father during these times and so many more, I honestly do not know if I would have made it through all of the pain." Michael Jr., Carmen and JoyceAnn also speak at length about the extraordinary bond Michael has formed with his older grandchild, Kylie, who is two, and how they cannot imagine the devastation she will feel if he is removed from her life. They also urge the Court to allow Michael's newborn grandchild to have the opportunity to bond with him in the way that Kylie has. *See* Letters of Michael Persico Jr., Carmen Persico and JoyceAnn Persico.

Many in Michael's extended family describe the importance of his support as well. To his nieces and nephews, he continues to be a role model even in their adult lives. Michael's niece Dominique Lippolis observes: "For my entire life, [Michael] has been there for me and my family…. [He] has made a huge impact on my life, and the respect I have for him is limitless….

28

He is the best example of what an uncle should be like." His niece Danielle Mannino similarly writes: "I have never seen [Michael] raise his voice or be disrespectful to anyone. He always said 'treat people the way you would like to be treated.' I have lived in that sense and am proud to say I learned these valuable lessons from him." Thomas Lippolis, Michael's nephew, likewise comments: "[Michael] has always inspired me to go far in life and [ ] do the best I can with what I have…. [Michael is] a mentor that has taught and cared for me for most of my life."

It is apparent to everyone around Michael how much his family truly depends on him. His business associate Michael LoDolce describes him as "the glue that bonds his family together." Michael's daughter-in-law writes: "[Michael's] family depends on [him] in many ways and there would be a big puzzle piece missing if he was taken away." Letter of Tara Persico. Noting that "[t]here are also many other family members and friends who depend on his [father's] guidance and help," Michael's son implores the Court to "[p]lease consider heavily the impact of removing [his] father from the lives of family and friends." Letter of Michael Persico Jr. Jessica Montgomery, a close friend of Michael's eldest daughter Carmen, observes: "Mr. Persico [is] [ ] there any time a family member, his children, or their friends needs him…. [I] hope [ ] you will consider Michael's children, who will certainly suffer and miss their father, as well as the other members of his family who count on him." Julie Nicotra, a friend of Carmen's since childhood, likewise expresses that "the damage [Michael's] absence would cause them breaks my heart because he raised some of the most generous, kind, loving and hard-working people I have had the privilege of knowing all these years."

The value Michael places on his family and friends is also evident in the support he provides during difficult times. As someone who knows the pain in losing a close loved one, Michael has always provided support for those experiencing similar difficulties. Rino Aprea recounts: "When my mother got sick, [Michael] was there for me.  He made sure that we were ok and he brought our family food and coffee to the hospital every day." Similarly, Barry Levin

29

confides: "When tragedy has struck my own family, Michael has always reached out and offered his assistance to both myself and my family."

As evidenced by the overwhelming number of letters attesting to his admirable qualities, it is clear that Michael is deeply valued by all who know him. *See, e.g.,* Letter of Frank Leone Jr. ("I have known Michael for many years and always found him to be a gentleman, a good son, brother, father and friend. I know that he plays a very important role in his family life."); Letter of John DiLeo ("Michael is one of the most decent and respectful people I know…. a good man not only to his family and friends, but to everyone. He has a way of making you feel better about yourself."); Letter of Gina Caleca ("Michael is a good man and I hope that you consider all of the people that love him when you impose his sentence."); Letter of Gigi Gambino ("[Michael is] a decent, polite wonderful human being who treats everyone with dignity and respect."); Letter of Donna and Robert Ottofaro (crediting Michael as "someone [we] feel make[ ] [us] better Christian[s] by the examples of his patience, trust, love and sincerity [that] he shows everyone individually."); Letter of Vincent DeMaggio ("As to Michael Persico's character I can say without reservation that I have found him always to be kind, polite and gracious…. Michael is a good man and I personally am grateful to know him."). As MaryBeth DiLeo insightfully observes: "[Michael's] family and friends are so supportive because he is a good man with a good heart. He is always willing to help a friend or family member in need. He puts the needs of others ahead of his own…. Michael is such a special person."

### C.    THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

When sentencing Mr. Persico, the Court must also consider the need to avoid unwarranted sentence disparities. Most notably, Anthony Preza, convicted of financing the $100,000 loan at issue in this case, received a sentence of probation. In fact, each of Mr. Persico's co-defendants who pleaded guilty instead of proceeding to trial received a sentence below (or, where the range was 0-6 months, at the lowest end of) the Guidelines range for his or

her offense of conviction. And despite the fact that all of these co-defendants were charged with crimes in addition to those to which they pleaded guilty, the Court did not consider the unconvicted conduct in determining their sentences. To be sure, even when sentencing Francis Guerra, who proceeded to trial and thus had no plea agreement, the Court only considered unconvicted conduct to determine where within the Guidelines range for his offense of conviction the sentence should fall, imposing a substantially lower sentence than that requested by the government. Further – and over the government's objection – the Court later reduced Guerra's sentence based upon a subsequent guidelines amendment.

Taking the co-defendants' sentences and the need to avoid disparity into account, then, we respectfully submit that the Court should also impose a below-Guidelines sentence on Mr. Persico. Strikingly, the government maintains that, even taking into consideration the unconvicted conduct it has alleged against Mr. Persico, a sentence of 37-46 months is appropriate. *See, e.g.,* Govt. Ltr. dated 1/19/15 (ECF 823). Of course, implicit in this position is a concession that a significantly below-Guidelines sentence is warranted if the unconvicted (and unproven) conduct is not considered.

## CONCLUSION

The extraordinary letters submitted on Mr. Persico's behalf speak volumes about his character. To everyone who knows him – friends, family and community leaders – Mr. Persico is a generous and remarkable man who has deeply affected all those who have entered his life. What is clear from these letters is that Mr. Persico is greatly needed by his family, especially his children, and he has positively impacted countless lives.

Mr. Persico accepts responsibility for and sincerely regrets his lapse in judgment in arranging the loan at issue. Recognizing this conduct to be aberrational, however, his friends and family continue to treasure him and attest to his innate good character. Thus, we respectfully ask that, in consideration for Mr. Persico's young daughters and other family members who need him desperately, and in light of his unique and compelling circumstances, this Court show compassion and mercy by imposing a sentence of time served, which in this case is undoubtedly "sufficient, but not greater than necessary."

Dated: New York, New York
        October 12, 2016

                    Respectfully submitted,
                        /s/
                    Marc Fernich
                    Maurice Sercarz
                    Sarita Kedia

32